**Dennis A. DIXON, Appellant,**

**v.**

**Louis JACOBS, Superintendent of Saint Elizabeths Hospital.**

**No. 23378.**

United States Court of Appeals, District of Columbia Circuit.

Order Feb. 5, 1970.

Opinion April 10, 1970.

Messrs. Charles R. Halpern and Stephen B. Rosenberg, Washington, D. C., with whom Mr. David J. Newberger, Washington, D. C., was on the motion, for appellant.

Messrs. Thomas A. Flannery, U. S. Atty., John A. Terry, Oscar Altshuler, and Gregory C. Brady, Asst. U. S. Attys., were on the motion, for appellee.

Before BAZELON, Chief Judge, and LEVENTHAL and ROBB, Circuit Judges, in Chambers.

BAZELON, Chief Judge:

This case presents several questions concerning the procedure to be followed by Saint Elizabeths Hospital and the District Court when a patient involuntarily committed desires his release. The appellant here was committed to the hospital in 1964, after his acquittal on grounds of insanity of charges of murder and assault with intent to commit carnal knowledge. On May 29, 1969, he petitioned the District Court *pro se* for a writ of habeas corpus, seeking release from confinement primarily on the ground that he had recovered his sanity and was no longer dangerous to himself or others.[1] 24 D.C.Code § 301(g)

---

1. With formal matter omitted, the petition reads in full as follows:

Comes now *Dennis A. Dixon*, hereinafter to be referred to as the Petitioner, who deposes and says that he is of Legal age, and that. he is a citizen of the United States, and that he is being held in violation of his rights. That the hospital is being Arbitrary —& Capricious in his confinement of him. Petitioner *Dennis A. Dixon*, is of sound mind and is no longer dangerous to himself or society:

Statement of Facts

(1.) Petitioner first entered this hospital on December 11, 1964, at which time he was suffering from Sexual Deviation, as so prescribed by Doctors of whom he was in the care of under a ninety (90) day observation period of time.

(2.) Petitioner now contends, he has used all treatment available to him, to cure him of said mental illness.

(3.) On or about the middle of January of 1968, the Petitioner Appeared in the United States District Court and the Attending Doctor, "Dr. Earl Baughman," was asked a question by Petitioner's attorney, that if said petitioner was held in Saint Elizabeths Hospital for nin[e]ty nine (99)

(1967); 21 D.C.Code §§ 546–549 (1967); Bolton v. Harris, 130 U.S.App.D.C. 1, 11–13, 395 F.2d 642, 652–654 (1968). The District Court ordered the hospital to show cause why the writ should not issue. On June 10, the hospital responded, alleging that appellant's initial commitment was lawful; noting that previous applications for release had been determined adversely to appellant in October of 1966 and July of 1968;[2] and moving to dismiss the petition "on the ground that the petitioner has failed to exhaust his administrative remedies."[3] The District Court, without holding a hearing or acting upon

years, would the Doctors be able to tell if he was well or not, by keeping him in maximum secur[i]ty. The doctor answered that he would not be able to tell, because of the type of secur[i]ty he is in.

(4.) Petitioner would like to have the transcript from this prior hearing on Writ of Habeas Corpus, to be made available as evid[e]nce in his behalf, that has not the money to get transcript as he has filed a paupers oath with Writ of Habeas Corpus.

(5.) Petitioner would also like to obtain for evidence in his behalf, a transcript from a Writ of Habeas Corpus, that was heard on or about the month of August of 1968, in which Petitioner's Doctor appeared and testified that said petitioner *Dennis A. Dixon*, had improved his mental condition much faster in such a short a period of time, as to the average person who has this type of mental illness and is committed or confined to this hospital, Saint Elizabeths Hospital.

(6.) Petitioner would also like to obtain for evidence in his behalf, the transcript of his trial on December 11, 1964.

(7.) Petitioner has been in The[rapy] since on or about October of 1968, and has also appl[i]ed hi[m]self to all other therapy that he is able to use, which included [e]nvir[on]mental therapy.

The above stated should sustain in itself, that Petitioner is of complete recovery from his mental illness and should be granted by the Honorable Court his complete discharge from Saint Elizabeths Hospital.

Conclusion

Petitioner states in concluding, that his confinement as it is now being carried out under the present circumstances, constitutes "Cruel and unusual and or unjust punishment."

Petitioner request[s] relief, due to the herein stated, in the kind and form of immediate release.

2. Although the hospital did not expressly so state, it appears from the records of the District Court that both previous applications were heard and dismissed on the merits. No appeal was taken in either case.

3. With formal matter omitted, the response reads in full as follows:

1. The petitioner, Dennis Allen Dixon (Dennis A. Dixon), alleges in effect that he is illegally detained in Saint Elizabeths Hospital, Washington, D.C. The respondent admits that the petitioner is confined in Saint Elizabeths Hospital, but denies that such detention is illegal.

The petitioner, Dennis Allen Dixon (Dennis A. Dixon), was admitted to Saint Elizabeths Hospital December 11, 1964, by order of the United States District Court for the District of Columbia, in accordance with the provisions of Title 24, Section 301(d), of the District of Columbia Code, as amended, after having been found not guilty by reason of insanity on charges of Assault With Intent To Commit Carnal Knowledge and Murder In The First Degree, Violation of Title 22, Sections 501 and 2401, of the District of Columbia Code in Criminal Number 705–63.

Copies of his commitment paper are attached hereto, marked Exhibit "A", and prayed to be read as a part of this return.

2. The petitioner, Dennis Allen Dixon (Dennis A. Dixon), does not allege that the respondent is acting arbitrarily and capriciously in failing to certify him for release.

3. For the information of the Honorable Court, the respondent respectfully invites attention to the fact that the petitioner, Dennis Allen Dixon (Dennis A. Dixon), has had previous appearances in Court on a writs of habeas corpus, viz., H.C. 399–66, heard on or about October 10, 1966, and H.C.

appellant's motion for the appointment of counsel, dismissed the petition without explanation.[4] Appellant, now represented by volunteer counsel, appealed to this court. We believe the hospital's response was insufficient as a matter of law to support dismissal; consequently, we reverse the judgment and remand the case to the District Court for further proceedings.

## I.

One preliminary matter requires mention. The government, conceding that nonexistent administrative remedies need not be exhausted, has moved that this case be remanded to the District Court to determine the existence and adequacy of the asserted remedies. We do not believe, however, that it would be proper for us so to dispose of this case. The government's concession of error does not relieve us of the responsibility for decision.[5] And several factors make this case inapposite for an unexplicated remand. We should not require a mental patient to shuttle back and forth between courts as his case is disposed of in piecemeal fashion.[6] Full treatment of this case will not require the decision of any constitutional questions.[7] It appears that the District Court does not normally make a practice of appointing counsel to represent indigent patients seeking release until the questions involved here have been passed.[8] Although the government has admitted that there is a serious question whether the claimed administrative remedies exist, it has continued to suggest to the District Court that petitions for release be summarily dismissed for

135–68, heard on or about July 8, 1968. In each instance, the Presiding Judge discharged the writ, dismissed the petition and remanded the petitioner to the custody of the respondent for further care and treatment.

4. The respondent moves to dismiss the petition on the ground that the petitioner has failed to exhaust his administrative remedies, including the right to periodic examination by the Hospital staff and the right to be examined by an outside psychiatrist, pursuant to 21 D.C.Code, Section 546. The Hospital records reveal that the petitioner has not submitted a written request to the Chief of Service for a current medical examination within the last six months. In Bolton versus Harris [130 U.S.App.D.C. 1, 395 F.2d 642 (1968)], the Court of Appeals expressly held that subsection (d) patients *must exhaust these administrative remedies* before applying for a writ of habeas corpus. [130 U.S.App. D.C. at 12 n. 59, 395 F.2d at 653 n. 59].

5. During petitioner's period of confinement in Saint Elizabeths Hospital, he has been under the care and observation of members of the medical staff of Saint Elizabeths Hospital, skilled in the care, diagnosis and treatment of nervous and mental disorders, who are of the opinion that he is mentally ill, suffering from Sexual Deviation, and that because of such illness is likely to injure himself or others if allowed to go at liberty.

WHEREFORE, the premises considered, the respondent prays that the writ of habeas corpus should not issue. The return was signed by the Superintendent of Saint Elizabeths Hospital, and approved by the Assistant United States Attorney responsible for such matters.

4. Almost ten years ago, we pointed out that it is "imperative that denial [of the writ of habeas corpus] be accompanied by an expression of the reasons for the denial either by informal memorandum, by recitals in an order, or by findings." Tatem v. United States, 107 U.S.App.D.C. 230, 232, 275 F.2d 894, 896 (1960) (Burger, J.).

5. Young v. United States, 315 U.S. 257, 258–259, 62 S.Ct. 510, 86 L.Ed. 832 (1942); United States v. Washington, 134 U.S.App.D.C. 135, 413 F.2d 409 (1969).

6. *See* Cross v. Harris, 135 U.S.App.D.C. 259, 269 n. 64, 418 F.2d 1095, 1105 n. 64 (1969).

7. *Compare* Petite v. United States, 361 U.S. 529, 531–532, 80 S.Ct. 450, 4 L.Ed. 2d 490 (1960) (Warren, C. J., concurring).

8. *E. g.,* Allen v. Jacobs, H.C. No. 162– 169; Walker v. Jacobs, H.C. No. 188069. *Compare* People ex rel. Rogers v. Stanley, 17 N.Y.2d 256, 270 N.Y.S.2d 573, 217 N.E.2d 636 (1966).

failure to exhaust administrative remedies.[9] Under these circumstances, we cannot in conscience avoid the questions before us.

## II.

 It is clear on this record that disputed issues of fact and law were before the District Court. Confinement of the mentally ill rests upon a basis substantially different from that which supports confinement of those convicted of crime. In the latter case, with rare exceptions,[10] the continuing validity of confinement rests solely on the validity of the initial commitment. Confinement of the mentally ill, however, depends not only upon the validity of the initial commitment[11] but also upon the continuing status of the patient. Specifically, under our statutes,[12] he must be released from the hospital if he is no longer mentally ill;[13] if, although he remains mentally ill, he is no longer "likely to injure himself or other persons";[14] or, should the patient so desire, if a course of outpatient treatment can be fashioned that will adequately protect the interests both of the patient and the public.[15]

 Therefore, when appellant sought his release from confinement, he brought those issues before the District Court.[16] Since all of the issues related to appellant's *present* status,[17] it could hardly be said either that the merits of his claim had been determined in prior proceedings[18] or that appellant's failure to present these issues in such

9. The government's motion was filed in this court on December 11, 1969. That same day, the hospital filed in the District Court motions to dismiss petitions for habeas corpus on the grounds that petitioners had failed to exhaust precisely the administrative remedies involved in this case. Bullock v. Jacobs, H.C. No. 247–69; Beard v. Jacobs, H.C. No. 243–69.

10. *E. g.*, Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) (challenge to manner rather than fact of confinement); Cox v. McConnell, 80 F.2d 258 (5th Cir. 1935) (expiration of sentence).

11. Lynch v. Overholser, 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962).

12. 21 D.C.Code §§ 546, 548 (1967); 24 D.C.Code § 301(e) (1967); *see* Bolton v. Harris, 130 U.S.App.D.C. 1, 11–13, 395 F.2d 642, 652–654 (1968).

13. Overholser v. Boddie, 87 U.S.App.D.C. 186, 184 F.2d 240 (1950) (en banc).

14. 21 D.C.Code § 546 (1967); *see* Bolton v. Harris, 130 U.S.App.D.C. 1, 12, 395 F.2d 642, 653 (1968).

15. Lake v. Cameron, 124 U.S.App.D.C. 264, 364 F.2d 657 (1966) (en banc).

16. "Petitions drawn by the inexpert hand of a layman in confinement are not scrutinized for the formal standard we properly require of practicing attorneys." Whittaker v. Overholser, 112 U.S.App. D.C. 66, 67, 299 F.2d 447, 448 (1962).

17. We have often pointed out, in similar contexts, the critical but limited role of the expert witnesses in helping the court (or, in appropriate cases, the jury) to determine these issues. Briefly stated, a person is mentally ill if he suffers from an abnormal condition of the mind that substantially affects mental or emotional processes, and substantially impairs behavioral controls. The presence of an abnormal mental condition, and the extent to which it impairs these processes and controls, are questions of fact; how "substantial" such an impairment must be to be considered a mental illness is a matter of law. The question of "dangerousness" is similarly mixed. The likelihood of future misconduct, the type of misconduct to be expected, and its probable frequency, are questions of fact; whether the expected harm, *and* its apparent likelihood, are sufficiently great to warrant coercive intervention under our statutes, are questions of law. *See* Cross v. Harris, 135 U.S.App.D.C. 259, 263–265, 418 F.2d 1095, 1099–1101 (1969); *cf.* Washington v. United States, 129 U.S.App.D.C. 29, 36–43, 390 F.2d 444, 451–458 (1967); In re Alexander, 125 U.S.App.D.C. 352, 372 F.2d 925 (1967).

18. *See* Sanders v. United States, 373 U.S. 1, 15, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963).

prior proceedings as may have been had amounts to "inexcusable neglect." [19] Consequently, "full consideration of the merits of the new application can be avoided only if there has been an abuse of the writ," Sanders v. United States, 373 U.S. 1, 17, 83 S.Ct. 1068, 1078, 10 L.Ed.2d 148 (1963), and in such cases "it rests with the Government to make that claim with clarity and particularity in its return to the order to show cause." Price v. Johnston, 334 U.S. 266, 292, 68 S.Ct. 1049, 1063, 92 L.Ed. 1356 (1948). Whether the record below could support dismissal on the ground of abuse of the writ is the question we next address.

### III.

 In its return to the order to show cause, the hospital pointed out that appellant had previously filed two petitions for release on habeas corpus, and that both had been determined adversely to him. The more recent of the two was decided in July of 1968—some ten months before the instant petition was filed. Although the return does not so indicate, it appears from the records of the District Court that both adjudications reached the merits of appellant's claim that he was entitled to release from the hospital; that an evidentiary hearing was held in each case; and that appellant was represented in each case by assigned counsel. It is clear to us that the District Court was entitled to take notice of its own records, but even assuming the adequacy of the factfinding process in the previous hearings,[20] sufficient time had passed since the last determination that appellant was entitled to raise the issue anew. Judicial guidelines in this area are admittedly vague;[21] under the circumstances, we think it is best to rely upon the standard set by Congress in analogous proceedings under 21 D.C.Code § 546 (1967). We hold, therefore, that a petition for habeas corpus by a mental patient seeking his release on the ground that his present status no longer justifies commitment may be dismissed as repetitive only if that ground was adequately heard and determined adversely to the applicant in a judicial proceeding

19. Townsend v. Sain, 372 U.S. 293, 317, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Fay v. Noia, 372 U.S. 391, 438–440, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); see Sanders v. United States, 373 U.S. 1, 18, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963); 28 U.S.C. § 2244(a) (Supp. IV, 1969).

20. Appellant has made no claim that the previous hearings were in any way inadequate. See Townsend v. Sain, 372 U.S. 293, 313–318, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

21. In In re Rosier, 76 U.S.App.D.C. 214, 133 F.2d 316 (1942), this court held that a fifteen-week delay entitled the appellant to a hearing on his present sanity. Each member of the court, which included Justices Stephens, Vinson, and Rutledge, wrote separately; Justice Rutledge, dissenting, suggested that perhaps one adjudication a year would be sufficient. Id. at 236, 133 F.2d at 338. Three years later, in a case challenging commitment pursuant to a criminal conviction, Rosier was overruled on other grounds. Dorsey v. Gill, 80 U.S.App. D.C. 9, 148 F.2d 857, cert. denied, 325 U.S. 890, 65 S.Ct. 1580, 89 L.Ed. 2003 (1945). Dorsey in turn was overruled and Rosier revived in Overholser v. Boddie, 87 U.S.App.D.C. 186, 184 F.2d 240 (1950) (en banc); but neither Dorsey nor Boddie dealt with the question at issue here. In Stewart v. Overholser, 87 U.S.App.D.C. 402, 186 F.2d 339 (1950) (en banc), a lapse of twenty months was held sufficient to require a new hearing; in dictum, a one-month lapse was stated to be insufficient. Finally, in Tatem v. United States, 107 U.S.App.D.C. 230, 275 F.2d 894 (1960), we required a hearing on the question of present sanity in the case of a petition filed two months after initial commitment; it should be noted, however, that in Tatem the initial commitment had been without a hearing on the question of present sanity. Perhaps in part because of the length of time normally required to bring a case here for decision, cf. In re Rosier, 76 U.S. App.D.C. 214, 237, 133 F.2d 316, 339 (1942) (Rutledge, J., dissenting), we never appear to have upheld dismissal of a petition for release as repetitive.

within six months preceding the new application.[22]

## IV.

 This court has often urged upon Saint Elizabeths Hospital its responsibility for the creation and administration of internal procedures for the review of its own decisions, as well as its statutory responsibility[23] for the maintenance of an adequate system of records to record and explain such decisions. *See, e. g.,* Covington v. Harris, 136 U.S.App.D.C. 35, 44, 45, 419 F.2d 617, 626–627 (1969). Proper performance of these responsibilities will in many instances diminish the need for judicial review by enhancing the reliability of the decision-making process,[24] and at the same time both aid and limit the judicial function in those cases where

judicial review is sought. Where the challenged decision relates essentially to the internal administration of the hospital—as, for example, when a patient seeks to enforce his right to adequate treatment;[25] when he seeks transfer to a less restrictive ward within the hospital;[26] and, perhaps, when he seeks conditional rather than unconditional release[27]—we have recognized "the responsibility the law places also upon those in charge of the institution." Covington v. Harris, *supra* at 47, 419 F.2d at 629 (Fahy, J., concurring). In such cases, judicial review is limited to the determination whether the administrator "has made a permissible and reasonable decision in view of the relevant information and within a broad range of discretion." Tribby v. Cameron, 126 U.S.App.D.C. 327, 328, 379 F.2d 104,

---

**22.** Of course, even if a previous application for release on the same grounds was heard and determined within the last six months, the District Court has full power to hold a plenary hearing on the issue if it believes that the interests of justice would thereby be served. *See* Sanders v. United States, 373 U.S. 1, 18–19, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963). We need not and do not here reach the question in what, if any, circumstances the Constitution may require a new hearing on present status in less than six months' time. Finally, we note that if a petition for release is based solely on grounds relating not to present status but rather to specific events in the past (for example, the legality of the initial commitment), the question whether a new hearing is required is essentially equivalent to that in the case of a prisoner seeking release under habeas corpus or equivalent process. See, for guidelines in such cases, Sanders v. United States, *supra.*

**23.** 21 D.C.Code § 562 (1967) provides, *inter alia*:
> The administrator of each public hospital shall keep records detailing all medical and psychiatric care and treatment received by a person hospitalized for a mental illness and the records shall be made available, upon that person's written authorization, to his attorney or personal physician.

**24.** In Covington v. Harris, 136 U.S.App. D.C. 44, 45, 419 F.2d 617, 626–627

(1969), we pointed out that
> [b]y articulating a plan of treatment and explaining the basis for important decisions affecting the patient, [such records] would fully inform the court at a glance. Incidentally, they would also enhance the integrity, reliability, and thoroughness of the hospital's own decision-making procedures. The bothersome incidental paperwork is a small price to pay for so many blessings. Besides, such paperwork is often bothersome precisely because the process of formal articulation forces busy administrators to confront problems and considerations their intuitive reactions might have overlooked.

**25.** Tribby v. Cameron, 126 U.S.App.D.C. 327, 379 F.2d 104 (1969); Millard v. Cameron, 125 U.S.App.D.C. 383, 373 F.2d 468 (1966); Rouse v. Cameron, 125 U.S.App.D.C. 366, 373 F.2d 451 (1966).

**26.** Covington v. Harris, 136 U.S.App.D.C. 35, 419 F.2d 617 (1969); Stultz v. Cameron, 127 U.S.App.D.C. 324, 383 F.2d 519 (1967) (en banc). Of course, if the patient's challenge is not that his mental condition does not require the particular restraints of the ward where he is confined, but rather that the ward is unfit for confinement of anyone, judicial review is plenary. Miller v. Overholser, 92 U.S.App.D.C. 110, 206 F.2d 415 (1953).

**27.** *See* Lake v. Cameron, 124 U.S.App. D.C. 264, 364 F.2d 657 (1966) (en banc).

105 (1967). The underlying question is to be decided not by the court, but by the hospital; and that decision cannot be meaningfully reviewed until the administrative process has run its course.

When the patient is seeking complete release from confinement, however, the scope of judicial review is broader. In such cases the function of the court is not simply to review the hospital's decision for unreasonableness, but rather itself to decide the ultimate question: whether the present status of the patient is such that continued confinement is justifiable.[28] The patient need only establish, by the preponderance of the evidence,[29] that he is no longer likely to injure himself or other persons because of mental illness. Bolton v. Harris, 130 U.S.App.D.C. 1, 12, 395 F.2d 642, 653 (1968). Correlative to the increased scope of judicial review is a more limited role for the doctrines requiring prior resort to administrative procedures. In the present case, the hospital suggested that dismissal was in order because of appellant's failure to exhaust two claimed administrative remedies. We examine each in turn.

The hospital's return noted that "Hospital records reveal that the petitioner has not submitted a written request to the Chief of Service for a current medical examination within the last six months."[30] It cited Bolton v. Harris, *supra* at 12 n. 59, 395 F.2d at 653 n. 59, for the proposition that "patients must exhaust these administrative remedies before applying for a writ of habeas corpus." We believe the hospital's position rests on a misunderstanding both of *Bolton* and of the statutory scheme. Periodic examination, with a view both towards eligibility for release and adequacy of treatment, is not a right available to patients only upon written request. It is a statutory duty imposed upon the hospital regardless of action taken by the patient.[31] The remedy that must be exhausted is not the request, but the examination. If an examination has been conducted within the last six months, further request would likely be useless; the remedy has been exhausted.[32] If the hospital has

---

28. *See* note 17 *supra*.

29. Since, as we have regularly pointed out, such proceedings are not strictly adversary in nature, conventional rules regarding the burden of coming forward with the evidence do not apply. The District Court and the parties bear an equal responsibility to see that decision is had upon all the relevant evidence. Bolton v. Harris, *supra* at 11 n. 64, 395 F.2d at 653 n. 64.

30. 21 D.C.Code § 546 (1967) provides, in part:
 A patient hospitalized pursuant to a court order obtained under section 21–545 . * * * may, upon the expiration of 90 days following the order and not more frequently than every 6 months thereafter, request, in writing, the chief of service of the hospital in which the patient is hospitalized, to have a current examination of his mental condition made by one or more physicians. If the request is timely it shall be granted. * * *
 The provisions of § 546 were made applicable to patients committed under 24 D.C.Code § 301 (1967) by Bolton v. Harris, 130 U.S.App.D.C. 1, 11–13, 395 F.2d 642, 652–654 (1968).

31. 21 D.C.Code § 548 (1967) provides:
 The chief of service of a public or private hospital *shall*, as often as practicable, but *not less often than every six months, examine or cause to be examined each patient* admitted to a hospital pursuant to this subchapter and if he determines on the basis of the examination that the conditions which justified the involuntary hospitalization of the patient no longer exist, the chief of service shall immediately release the patient.
 (emphasis added). Except for the provision regarding release without judicial supervision, this section applies to § 301 (d) patients as well. *See* Bolton v. Harris, *supra* note 30 at 11, 395 F.2d at 652.

32. In some circumstances, the hospital may desire to re-examine the patient after the petition has been filed even though less than six months have elapsed since the last previous examination. On an appropriate showing, the District Court may in such cases defer action on

ignored its duty to the patient in its care, its misconduct may not be imputed to the patient.[33] Only if the required examination is in progress when the petition is filed has the patient failed to "exhaust" this remedy. In such cases, the District Court should defer action on the petition pending completion of the examination. If, at that point, the patient desires to continue with his petition, the court should proceed to determination. Since the present return gives no indication when appellant was last examined or, if an examination was in progress at the time, how long this examination would take to carry out, it is insufficient to support postponement for failure to exhaust that remedy.[34]

■■■ The hospital's second suggestion was that appellant had failed to avail himself of his "right to be examined by an outside psychiatrist." [35] We likewise conclude that this response was insufficient to justify a delay in reaching the merits below. For the requirement that administrative remedies be

exhausted before judicial decision is had presupposes both that the remedies exist [36] and that they are adequate to protect the interests asserted.[37] Both of these facts must be demonstrated to the District Court before it may defer to the administrative body.[38] The present return is inadequate on both grounds.

The return gives no indication how such an examination might be requested, nor does it indicate that such a request, if made, would be honored. Papers filed in this court suggest that no funds are available to compensate outside psychiatrists for the examinations required by statute, and that in consequence no such examinations are being made.[39] The government has not sought to dispute this claim; and in consequence, we would not feel justified in construing the return, filed under oath in the District Court, as swearing that outside examinations were in fact available. And unless so construed, the return cannot provide the District Court with the information necessary for it to conclude

the petition pending completion of this new examination.

33. Although the hospital's return gave no indication of the fact, appellant has filed as an appendix to his brief a portion of the hospital records which indicates that he was actually examined on June 2, 1969—four days after he had filed his petition, and eight days *before* the hospital's return was filed. With some regret, we cannot avoid the conclusion that the hospital was less than candid in this respect with the court below. *See* note 29 *supra*.

34. From what we have already said, it should be apparent that lack of the required examination would never serve to justify dismissal, as opposed to postponement, of the petition.

35. 21 D.C.Code § 546 (1967).

36. *See* United States v. Anthony Grace & Sons, 384 U.S. 424, 429–430, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1965); Smith v. Illinois Bell Telephone Co., 270 U.S. 587, 46 S.Ct. 408, 70 L.Ed. 747 (1926).

37. United States Alkali Export Ass'n v. United States, 325 U.S. 196, 65 S.Ct. 1120, 89 L.Ed. 1554 (1945).

38. *Cf.* Noyd v. Bond, 395 U.S. 683, 698 n. 11, 89 S.Ct. 1876, 23 L.Ed.2d 631 (1969).

39. Appellant has filed, as an appendix to his brief, correspondence between one patient who requested an outside examination and the hospital staff. The request was made on December 3, 1968. After two further requests, on December 30 and January 1, 1969, the patient received a letter from the hospital dated January 28, 1969, suggesting that he write the Department of Public Health. The Department, on March 28, informed the patient that no funds were available for such examinations. On October 7, 1969, the Department wrote appellant's counsel to confirm his understanding that not only were no funds available for these examinations, but also psychiatric personnel were not available to allow the Department to perform such examinations even if funds could be found. This letter is filed as part of the appendix to appellant's opposition to the government's motion for an extension of time in which to file its brief.

that the remedy to be exhausted in fact exists.

Even if the hospital's return could be taken to demonstrate the existence of the remedy, however, it fails completely to demonstrate its adequacy. A remedy is not adequate if it cannot be invoked by the patient, and even simple procedures may well be beyond the abilities of many of those confined at Saint Elizabeths. We believe that the hospital is adequately informed of a patient's desire to invoke such internal remedies as exist by the filing of a petition seeking judicial review in the District Court. In order, therefore, to raise the defense of failure to pursue administrative remedies, the hospital's return must inform the court not only that these remedies have not yet been invoked, but also that the hospital is presently setting in motion those procedures available to the patient for internal review. The return should also provide the court with an indication of the time likely to be required before these procedures are completed. Only then will the District Court be in a position to make an informed decision on the existence and adequacy of the administrative mechanisms available to the patient. And unless the District Court is able to conclude that adequate internal procedures are available to the patient, it may not defer consideration of the merits of his petition for failure to invoke these procedures.[40]

## V.

We are compelled to close on a note of sadness. Procedures to determine the proper disposition of the mentally ill are among the most difficult that must be faced by the courts. The decisions that must be made are difficult at the very best; without full cooperation by all parties to the proceedings, they are nearly impossible. The District Court in particular faces an awesome task. It is charged not only with the ultimate responsibility for decision, but also with the duty of assuring, in the last analysis, that the interests of the patient and the public are properly protected. The appointment of capable counsel can serve to lift some of the burden from the shoulders of the court, and we urge the District Court to make fuller use of this tool. But even counsel cannot do the whole job.

It is in this regard that Saint Elizabeths bears a special responsibility for assuring that information regarding the patient's condition is fully presented to the District Court, and that the court understandingly considers the information presented. We can understand a defensive reaction from those whose professional judgment is challenged when a patient seeks release from the hospital; we can sympathize with a psychiatrist's distaste for appearing in court, both because of the time lost from other activities and because of the possibility that, either through failure of communication or through pressures inherent even in the less-than-adversary proceedings here involved, he will be made in public to appear a fool. But psychiatrists may not, for the sake of preference or convenience, avoid their duty to the patients entrusted to their care. It is no insult either to the integrity or to the professional skills of the doctors at Saint Elizabeths Hospital to point out again that the ultimate determination of eligibility for release is, under our statutes, a matter of law for the determination of the court. This determination cannot be properly made without the fullest explanation from the expert witnesses of the patient's mental condition. But once

40. Of course, as in the case of examinations by the hospital staff, if adequate internal remedies are in process the proper procedure is to delay action on the petition rather than to dismiss it. It may well be that, when internal review is complete, the patient will be satisfied with the results and no longer desire judicial intervention. If so, the petition may be dismissed. But we do not think it justifiable to require a mentally ill patient whose claim has not been considered by the court because internal procedures have not been completed to file a new petition when those procedures have run their course.

that condition has been determined, the standards for release must be applied by the court.

It is hard to understand the behavior of the hospital authorities that is shown by this record. In response to appellant's petition for release, the hospital made no effort to ventilate the issues for decision; its reaction was only to attempt to avoid any review whatsoever of its action. Although it has conceded in this court—where appellant is represented by counsel—that the action below was improper, it has continued to urge the District Court to take precisely the same action on petitions filed by patients unrepresented by counsel. This is hardly the standard one would expect from a body dedicated to the welfare of its patients.

It is inevitable that those involved in the decision-making process will thereby obtain a stake in upholding the correctness of their decision once reached. Few, if any of us enjoy having our determinations changed by higher authority. But we must never lose sight of the fact that, whether the hospital's decision is overthrown or upheld, whether the District Court's judgment is reversed or affirmed, the strongest impact is not on the decision-maker but upon the patient. His interests, not those of the hospital or of the courts, must be the paramount factors bearing upon decision.

The judgment of the District Court is reversed, and the case remanded for further proceedings consistent with this opinion.

So ordered.

LEVENTHAL, Circuit Judge:

I concur in the result and in so much of the opinion as explains why the hospital authorities, including appellee superintendent, could not validly claim in the District Court that appellant's petition for habeas corpus must be dismissed for failure to exhaust administrative remedies.

As to the rest of the opinion, I feel obliged to say that passages I believe to be dicta set forth views as to which I have grave reservations.

The paramount factor bearing on decision is not the interest of the patient, but rather the interest of society, which includes of course, as a key element, the interest of the patient in not being subject to confinement that is unreasonable or without foundation.

I concur in requiring some continuing review, by hospital authorities and courts, of the possibility that a criminal defendant no longer represents a danger to society.

What I find doubtful is the view of the majority opinion that because Congress has provided that a civilly committed person cannot be kept in confinement if he is not *"likely"* to injure himself or other persons," [1] the same standard governs a man who has killed another, and is relieved of a conviction for that homicide only because of a doubt that this may have been the product of a mental disease.

Plainly the acquittal by reason of insanity reflects a jury determination, beyond a reasonable doubt, that except for the defense of insanity, defendant did do the act, e. g. kill the deceased, and have the intent, that constitutes the substantive crime without any exculpation or mitigation in non-insanity defenses (e. g. self-defense). Lynch v. Overholser, 369 U.S. 705, 714, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962). If a jury is not ready to make that determination it must acquit completely, without going on to consider the insanity defense.

Congress has provided in 24 D.C.Code § 301(d) that a person acquitted of a crime by reason of insanity shall be immediately hospitalized even though there is no finding by anyone, and no testimony by anyone, that he is "likely" to commit another dangerous act. The majority apparently accepts the validity of that initial difference in procedure from

1. 21 D.C.Code §, 546.

the provisions in Title 21 of the D.C.Code pertaining to those who are civilly committed. Why is it reasonable for Congress to provide for immediate confinement of the criminal defendant based upon the possibility (reasonable doubt), not probability, that the unfortunate action was the product of mental illness, even though there is no finding that this or any other dangerous act is likely to recur? The question is not an easy one to answer, but I think part of the answer reflects a reasonable difference in standards that makes it permissible, even without a finding that danger is "likely" to erupt in the future, to detain someone who has committed an act that is criminal save for the doubt as to mental responsibility.

The Code provides that the court shall release a person acquitted by reason of insanity "if the court finds that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or others." 24 D.C.Code § 301(e). It may well be that in the case of a defendant who presents a substantial problem of danger in the reasonable future, by virtue of his mental condition, the finding in 301(e) cannot be made even though it cannot be said that this danger is "likely." I am not ready to say that this difference from the standard provided for those merely civilly committed (see note 1) is repugnant to fairness or the Constitution.

This difference goes beyond the obvious point that the action that resulted in the trial will at a minimum be "strong evidence" that he may in the future be a danger to peace. Lynch v. Overholser, *supra,* 369 U.S. at 714, 82 S.Ct. 1063. It goes to the question of what society may reasonably provide when the evidence, though strong, establishes only that a substantial problem exists and does not show a likelihood that danger will recur. I think the existence of a substantial problem is not an adequate basis to confine or detain a man who has never harmed his fellow man, never committed the physical elements of a crime. But I would like at least to reserve the question whether the existence of a substantial problem may be enough basis to detain and confine someone who (except for the doubt as to mental responsibility) has committed a criminal act, at least if an act of violence was involved—unless the court is prepared to make some affirmative finding that it is at least more probable than not that he will not be violently dangerous in the future.[2]

I realize that I am now expressing a reservation on a point that was discussed in Bolton v. Harris, 130 U.S.App. D.C. 1, 395 F.2d 642 (1968). I fully agree with *Bolton* insofar as it concludes that subsection (d) may fairly be read— and in view of constitutional principles should properly be read—so that persons who invoke the insanity defense are not denied a judicial hearing and "procedures substantially similar to those in civil commitment proceedings."[3] What troubles me is that passage of *Bolton* which states that equal protection requirements dictate that the burden of proof in establishing eligibility for release for subsection (d) patients "must be the same as that for civilly committed patients."[4] Insofar as *Bolton* went beyond the procedural aspects of subsection (d) redeterminations and procedures for release, and discussed the standards governing judicial decisions on such applications, its expressions seem to me to be dicta, and as it happens dicta as to which I have grave reservations.

2. While there is a problem in terms of its literal wording, the intent of § 301 (d) does not seem to me to require detention of someone affirmatively determined as unlikely to be dangerous merely because he has a mental disease or defect that could come within the definition of insanity.

3. 130 U.S.App.D.C. at 10, 395 F.2d at 651, 653.

4. 130 U.S.App.D.C. at 12, 395 F.2d at 653.

In exploring whether there may be significant grounds for some difference in burden of proof or persuasion I revert to Lynch v. Overholser, *supra*, where the Court, in holding that the provisions of § 24–301(d) were not applicable to those who did not claim they were mentally irresponsible, said (369 U.S. at 715, 82 S.Ct. at 1069):

> Congress might have thought, however, that having successfully claimed insanity to avoid punishment, the accused should then bear the burden of proving that he is no longer subject to the same mental abnormality which produced his criminal acts. Alternatively, Congress might have considered it appropriate to provide compulsory commitment for those who successfully invoke an insanity defense in order to discourage false pleas of insanity. We need go no further here than to say that such differentiating considerations are pertinent to ascertaining the intended reach of this statutory provision.

I see no reason to conclude that these words penned by Justice Harlan in 1963 were scrapped in 1966 by Baxstrom v. Herold[5] in which he joined. What *Baxstrom* focused on were (a) procedures for civil commitment (need for jury determination) which were (b) extended on equal protection grounds to one whose prison term was about to expire (in fact did expire prior to the habeas proceeding), and who would thereafter be held on a new commitment. The applicable standard extended by the Court permitted release only if the person showed that he was sane.[6]

It seems to me likely that an important aspect of the 301(d) cases is that they are a class of cases in which the issue of mental irresponsibility is more doubtful. When the lack of mental responsibility is more clear the prosecutor himself is likely to invoke civil commitment rather than criminal proceedings. And if he does bring criminal proceedings the court may invoke insanity procedures without regard to or awaiting the motion of the defendant.

But if there is a greater doubt as to mental irresponsibility at the time of offense there may well be greater danger of calculated abuse of the defense. There is also a possibility—I am not well enough informed to say whether it is a probability—that the condition involved may be one which is less clearly defined and understood by the medical profession, that there is more doubt as to the existence of an illness, its connection with a past offense, and any future prognosis and forecast of danger.

There is an anomaly of sorts, but I think it may well be more surface than profound, in my willingness to consider further whether the class of persons more clearly ascertained as having serious mental problems (the civilly committed) may properly have a lighter burden for release. This could make very good sense if it turned out that in general that class is one as to which future predictions could be made with greater reliability and authority. The considerations suggesting reasonableness of a difference in standards are enlarged when we turn from purely medical considerations to others that are also involved, including the possibility that some part (unascertainable in extent) of the class of 301(d) patients may have meaningful elements of responsibility

5. 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966).

6. The New York court's extension of this provision to persons acquitted of crime by reason of insanity must be read in light of the provision, New York Mental Hygiene Law, McKinney's Consol.Laws, c. 27, § 74, that civilly committed persons could obtain release by jury trial only if the jury affirmatively found the defendant "to be sane" (*see* 383 U.S. at 111, 86 S.Ct. 760).

In People v. Lally, 19 N.Y.2d 27, 277 N.Y.S.2d 654, 244 N.E.2d 87, 91 (1966) defendant challenged the validity of confinement "by alleging and showing that he is not in fact insane." There was no provision for release because of the existence of doubt—or the failure to find a likelihood of danger.

for the offense, even though there is enough doubt to obviate a verdict of guilty.

This is not to suggest that there may be an indefinite hospital confinement based on doubt. There is an equal protection issue when a prisoner has served his prison sentence, and he may not thereafter be hospitalized on a different standard from that applicable to other citizens. Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966). The same considerations are, I think, fully applicable to one who has been confined in a mental hospital for a period equal to the maximum term permitted by law for the offense he committed (less mandatory release time provided by statute for those on good behavior during confinement). In that event the government cannot invoke a lesser standard to justify further confinement than that which it must meet for those never charged with crime.[7]

It may well be that there is another cut-off point in time of commitment— say the 5-year period presented by the Report of the A.B.A. Committee on Sentencing[8]—which results in such a coincidence of both dilution of danger of abuse from those invoking the insanity defense and heightened reliability of prognosis, as to warrant condemnation of any further use of a different standard in 301(d) as arbitrary, an unreasonable perpetuation of commitment on the basis of substantial problems rather than likelihood of danger.

I do not believe or suggest, and do not consider that my reservation as to the majority opinion implies, that an individual is in any way to be "punished" because he was acquitted by reason of insanity. There is homely truth in the proposition that re-structuring of a person convicted of crime must begin with the determination, on his plea or on a verdict, that he was guilty of an anti-social act and bears responsibility for the commission of that act. I am also prepared to accept, at least as a working hypothesis, that the re-structuring of a person with mental illness, to the extent that such re-structuring may be possible, should begin with the explicit assumption that although he has engaged in conduct that is harmful to society he need not be trammeled by a sense of guilt in his effort to cope with the difficult task of changing his condition with treatment. But there is room for confinement without punishment because of danger, as is true not only of the mentally ill, but also of those who will infect others with disease (sometimes, as in the case of Typhoid Marys, though they are not themselves disabled by the disease). And in the case of confinement without punishment, I think there may be room for a difference in the standard that governs the issue of detention or release for the person who has already unhappily manifested the reality of anti-social conduct, perhaps even shifting to him the burden of proof that decides the doubtful case where we cannot have confidence in our predictions. In the last analysis the issue is one that inextricably intertwines public morality and public need.

These are large issues, and it may well be that the possibility of a difference in standards is more likely to provoke controversy in the abstract than ever will arise in disposition of particular cases. Perhaps the definition of the standard would be better developed in the light of particular cases, involving particular individuals and their prognoses, dangers, and histories (including the acts giving rise to the criminal charge or charges). It is certainly true that conclusions as to what should be done in particular cases will be most

7. As a realistic matter the standard should be the same when the person has been confined (in the hospital) for a period equal to the sentence generally meted for such offenses, even though less than the maximum.

8. ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Sentencing Alternatives and Procedures 48 (1968).

aided if the facts are clearly presented so far as they are known or knowable.

The hospital's examination when made must be meaningful, and the conclusions subject to meaningful review. The exhaustion doctrine, established to ensure the essence of meaningful review, may not soundly be used to avoid such review, or to exhaust the patient rather than his remedies. On these matters I concur unreservedly in the opinion of the majority.