**In re John Wesley HANNA.**

**No. 83-224.**

District of Columbia Court of Appeals.

Argued June 19, 1984.

Decided Nov. 2, 1984.

---

Edward E. Schwab, Asst. Corp. Counsel, Washington, D.C., with whom Inez Smith Reid, Corp. Counsel, John H. Suda, Principal Deputy Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the briefs, for the District of Columbia.

Bruce B. Vignery, Neighborhood Legal Services Program, Washington, D.C., filed a brief for appellee Lillie McCord.

John J. Connelly, Washington, D.C., Information Center for Handicapped Individuals, Inc., for appellee John Wesley Hanna.

Joan L. Goldfrank, Staff Attorney, Saint Elizabeths Hospital, Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on the brief, for intervenor.

Before PRYOR, Chief Judge, and FERREN, Associate Judge, and GALLAGHER, Associate Judge, Retired.

PER CURIAM:

John Wesley Hanna was committed to St. Elizabeths Hospital (Hospital) in 1972 pursuant to D.C.Code § 21–501 *et seq.* (1981) (Ervin Act). While considering a petition for Hanna's commitment to another institution as a mentally retarded person pursuant to *id.* § 6–1901 *et seq.* (Retarded Citizens Act), the court ordered his discharge

based upon the Hospital's assessment that he was not mentally ill. Following presentation of testimonial and documentary evidence to a Hearing Commissioner and, thereafter, oral argument before the court, the court granted the petition and ordered Hanna's commitment under the Retarded Citizens Act.[1] The District of Columbia appeals, arguing that the trial court erred in failing to conduct an evidentiary hearing testing the Hospital's determination that Hanna was not mentally ill. We reverse and remand for further proceedings.

**I**

In 1962, at age five, Hanna was diagnosed as severely mentally retarded and committed to Forest Haven. *In re John Wesley Hanna,* D.C. Training School No. 41–62 (D.D.C.1962). Hanna's behavior became more aggressive soon after his arrival at the institution, leading to several attacks on his fellow patients. On a number of occasions he was referred for psychiatric evaluations and was eventually civilly committed to the Hospital in 1972. In 1974, while living at the Hospital, Hanna killed an elderly patient and was transferred to the institution's John Howard Pavilion.[2] He was subsequently charged with second-degree murder, referred for a competency determination and diagnosed as having "severe mental retardation (IQ 29) ... and [un]likely to regain competence in the foreseeable future." The homicide charge was eventually dismissed, and Hanna was returned to the John Howard Pavilion where he has resided since 1974.

In 1981, Hanna's grandmother as well as members of the Hospital staff became concerned that the Hospital had no programs suited to his particular needs and petitioned the court to order his commitment under the Retarded Citizens Act. A Hearing Commissioner received testimony from sev-

eral mental health professionals concerning Hanna's present state and concluded that he must be institutionalized, reserving for the court the question of whether commitment as a retarded person is required. The record reveals that Hanna's treating psychiatrist at the Hospital, Dr. Smith, diagnosed him as mentally retarded and concluded that the degree of retardation made it impossible to determine whether he was mentally ill as well. Similar conclusions were reached by a court-appointed psychologist and a psychologist representing the Department of Human Services. Dr. Eist, a consultant for the District of Columbia, was the only mental health professional to determine that Hanna is mentally ill. However, the doctor acknowledged that Hanna is also severely mentally retarded and that any psychosis he suffers may be caused by retardation. Moreover, the record demonstrates that Dr. Eist's conclusion that Hanna is a "proph-schizophrenic" is not among the diagnoses recognized in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (3d ed. 1980).

In these circumstances, the District of Columbia contends that the trial court was obliged to conduct an independent evidentiary hearing and provide findings and conclusions on the question of Hanna's mental illness.

The court did not do so. Based upon the record of testimony before Commissioner Doyle, as well as upon the representations of the Hospital's counsel, the court found that the hospital's "Chief of Service" had determined "after a § 21–548 review examination" that Hanna was "no longer mentally ill." Thus, "[f]or all legally relevant purposes he has been discharged from St. Elizabeths and could be released today. D.C.Code § 21–548 (1981). Mr. Hanna is

1. Hanna is presently residing at the Hospital until placement at a second institution may be arranged.

2. The Pavilion is a secure facility and although used primarily to house criminal defendants

found not guilty by reason of insanity or those awaiting competency determinations and trial, the Hospital staff determined that Hanna's aggressive behavior made placement in a less restrictive setting unwise.

not mentally ill." The court also observed that Hanna's "release could legally have been effectuated a long time ago ... [w]ere it not for the well-founded concerns of St. Elizabeths' staff about the safety of both the community and Mr. Hanna."[3] The court then concluded that Hanna was "a mentally retarded person in need of commitment under D.C.Code § 6–1901 *et seq.*" The court ordered Hanna committed under the Retarded Citizens Act and further ordered his release from civil commitment "at such time as the services and placement to which he is entitled under D.C.Code § 6–1901 *et seq.* (1981) are available and functional."

## II

As the trial court itself recognized, a civil committee is releasable, solely at the instance of the hospital's chief of service, if the chief "determines that the patient is no longer mentally ill to the extent that he is likely to injure himself or other persons if not hospitalized...." D.C.Code § 21–546 (1981). Thus, if the chief determines, after an examination (required every six months), "that the conditions which justify the involuntary hospitalization of the patient no longer exist, the chief of service shall immediately release the patient." *Id.* § 21–548. In considering whether Hanna should receive habilitation under the Retarded Citizens Act, the court accordingly had to answer a threshold question: whether the chief of service had released Hanna, or, more appropriately—since the hospital still had custody—whether the chief of service had, in fact, concluded that he was releasable.

In answering this question, the court has no authority to review the chief's determination on the merits, since release is discretionary with the hospital. The court, rather, is limited to determining whether the hospital's assessment is "permissible and reasonable," *Dixon v. Jacobs*, 138 U.S.App.D.C. 319, 327, 427 F.2d 589, 597 (1970), *i.e.,* whether the decision is based solely on statutory grounds and not motivated by concerns incompatible with the aims of the Ervin Act. *See In re Hurt*, 437 A.2d 590, 595 (D.C.1981). In this case, for example, there was an implicit concern as to whether the hospital's support for Hanna's habilitation under the Retarded Citizens Act was motivated, to any extent, by the fact that the costs of his treatment would be shifted from the federal government, which operated St. Elizabeths Hospital, to the District of Columbia government, which is responsible for commitment and treatment under the Retarded Citizens Act.

Accordingly, it was critical for the trial court to determine whether the chief of service—in this case Dr. Smith—had concluded on "permissible and reasonable" grounds, *Dixon, supra*, 138 U.S.App.D.C. at 327, 427 F.2d at 597, that Hanna was releasable under D.C.Code §§ 21–546, –548 (1981). The court had no authority to make an independent determination as to whether Hanna was mentally ill, based on all the psychiatric and other testimony at the Retarded Citizens Act proceeding before Commissioner Doyle.

Although the court, as noted above, did find that the chief of service had determined that Hanna no longer was mentally ill, the record of Dr. Smith's testimony suggests otherwise:

THE COURT: ... Have you been able to reach a determination as to whether or not he is mentally ill?

DR. SMITH: No, I have not.

MS. DORSCH: Well, can you honestly say that the mental illness has subsided. He is no longer as dangerous to himself or others by virtue of that mental ill-

---

3. The Ervin Act requires the chief of service to examine patients periodically and, if it is determined that the conditions justifying involuntary commitment no longer exist, they shall be released immediately. D.C.Code § 21–548 (1981).

However, here the court found that the hospital had acted properly in continuing Hanna's detention on a temporary basis until an appropriate facility could be located.

ness? ... Can you say that John is no longer mentally ill and that he is no longer dangerous to himself or others?

DR. SMITH: No.

A colloquy among Ms. Grannum (counsel for St. Elizabeths), Dr. Carr (coordinator of Psychological Services at St. Elizabeths), and Dr. Smith makes clear their view that Hanna presents a "dual problem"—mental illness (and related dangerousness) and mental retardation:

MS. GRANNUM: St. Elizabeths Hospital would have no problems with discharging him and placing him—rendering him to the authority of the Commissioner under the MR Act, if he were to go to a facility. Our obligations are to treat him for psychiatric illnesses as an in-patient or as out-patient, whichever we deem appropriate. *Dr. Smith has indicated that he can't even assess, because of the severity of Mr. Hanna's mental retardation, whether or not there is a mental illness that can be treated.* So, I think in essence, that's a clear statement that there will be no benefit derived from a continued in-patient psychiatric care. *Our concerns also because of the civil commitment, run to the dangerousness issue of whether or not he would be likely to injure himself or others if he were placed in the community,* and those issues, I believe, could be satisfied if we were consulted on the facility he was placed in. From what I understand and what appears to be going on here, it is the consensus and the findings of the Commission that placed in a facility would be appropriate for him. *So once we knew the facility, I don't think there would be any problems in discharging him,* which we have complete discretion to do because he is a civilly committed patient and not a criminally committed patient; we would have the discretion to determine when it was appropriate to discharge him.

DR. CARR: I don't understand something here. Maybe you can elucidate something to me. You're saying that Dr. Smith's position is that because he could not discern how much of his problem was mental retardation versus mental illness that you probably feel that he could no longer derive any more benefit from—

MS. GRANNUM: Psychiatric care.

DR. CARR: —psychiatric care.

MS. GRANNUM: Well, Dr. Smith, is that correct?

DR. SMITH: Oh, yes.

DR. CARR: See now, I'm in a position where I don't know where in his particular case where mental retardation begins and where mental illness begins or ends. I mean, it just presents a very confusing picture. I do know that if the civil side of civil division, excuse me. St. Elizabeths refused to accept him because of his high risk nature of his behavior, and that is an institution for the mentally ill, *I do know he would probably pose just as great a threat to a vulnerable population, such as mentally retarded.* So, again, to make these holistic statements without making some qualifications about his level of mental illness and his mental retardation, I don't know of any of us in this room who are in a position to make that statement because of the complexity of his emotional and social adaptive development.

MS. GRANNUM: Well, I think what we have to address is what are his needs and what can rehabilitate him. And if a psychiatric institution cannot meet his needs, then he should be in a facility for the mentally retarded. St. Elizabeths does not have the programs, is not a facility for the mentally retarded. So we could not help him. He would derive no benefit from remaining at the hospital as everyone, I believe has concurred that St. Elizabeths is an inappropriate place for Mr. Hanna.

DR. CARR: *Well, I think what we're saying here is not just a single problem. It's a dual problem.* Okay—

MS. GRANNUM: And I think if he's mentally retarded—

DR. CARR: —Excuse me, can I finish. *What I'm saying is this is probably a situation that includes both emotionality and mental retardation. So it would require any facility he would be in would have to have a behavioral management component, as well as some component to deal with whatever emotional acting-out problems he has.* We're just not that clear. So I just do not want people to get the impression that all of his problems are just mental retardation and none of it is mental illness, because we just don't know. [Emphasis added.]

■ The problem on review, therefore, is that, although St. Elizabeths, through counsel, ultimately took the position before the trial court and on appeal that the hospital has concluded Hanna is releasable under D.C.Code §§ 21–546, –548 (1981), the record of the hearing before Commissioner Doyle, on which the trial court relied, does not bear this out. Dr. Smith's position, as chief of service, buttressed by Dr. Carr, coordinator of the hospital's psychological services, appears to be that Hanna is both mentally ill and retarded and thus presents a dual problem that—it would appear by definition—does not suggest release under *id.* §§ 21–546, –548 merely because he is also mentally retarded and thus committable under the Retarded Citizens Act.

Accordingly, we must reverse and remand for further proceedings. If the court concludes, after further hearings, that the St. Elizabeths' chief of service has determined Hanna is releasable under *id.* §§ 21–546, –548, then the court may proceed to disposition solely under the Retarded Citizens Act. But if the court concludes that the hospital's diagnosis does not permit release—*i.e.,* if the chief of service does not determine that Hanna "is no longer mentally ill to the extent that he is likely to injure himself or other persons if not hospitalized," *id.* § 21–546, then the court will have to determine whether the law permits treatment under both the Ervin Act and

the Retarded Citizens Act and, if so, how that can be accomplished.

*So ordered.*