## In the Matter of Elmos R. LOMAX, Appellee.

### No. 10311.

District of Columbia Court of Appeals.

Argued May 18, 1976.

Decided Dec. 20, 1976.

Rehearing en Banc Granted April 19, 1977, and Judgment of December 20, 1976, Vacated.

Silas J. Wasserstrom, Public Defender Service, Washington, D. C., with whom Frederick H. Weisberg, Public Defender Service, Washington, D. C., was on the brief, for appellee.

Before FICKLING, HARRIS and MACK, Associate Judges.

HARRIS, Associate Judge:

This is an appeal from an order of the trial court dismissing a petition for appellee's judicial hospitalization and releasing appellee from Saint Elizabeths Hospital, after a jury found that appellee, although mentally ill, was not likely to injure himself or others if allowed to remain at liberty. See D.C.Code 1973, § 21–545(b). Appellant, the Superintendent of Saint Elizabeths Hospital, contends that a prejudicial opening statement by appellee's trial counsel tainted the verdict and requires a remand for a new trial. Appellee argues that the government may not appeal from a jury verdict in favor of a patient under the Hospitalization of the Mentally Ill Act (D.C.Code 1973, § 21–501 et seq.), and that we accordingly should dismiss the appeal. He further argues that if the trial court's order is appealable, no reversible error occurred. We hold that the government has the right to appeal from an order releasing an allegedly mentally ill person from custody, and that certain opening remarks by appellee's trial counsel irreparably prejudiced the jury. We conclude that the trial court erred in denying the government's motion for a mistrial, and reverse.

Alexia Morrison, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry and John C. Martin, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellant Superintendent, Saint Elizabeths Hospital.

I

For the purpose of the proceedings which are the subject of this appeal, Mr. Lomax was admitted to Saint Elizabeths Hospital on August 25, 1975, pursuant to the emergency hospitalization provision of D.C.Code 1973, § 21–521.[1] The Superin-

1. Appellee had been admitted to Saint Elizabeths Hospital on five earlier occasions.

The first period of institutionalization, from August 1961 to March 1962, ended when ap-

tendent then petitioned the court for appellee's judicial hospitalization. *Id.* § 21–541. In accordance with § 21–542, the Mental Health Commission held several hearings to determine whether appellee should be hospitalized. Its report recommended either his detention at Saint Elizabeths for an indeterminate period or his placement in a foster care home. Appellee, through counsel, demanded a jury trial.[2] *See* D.C. Code 1973, § 21–544.

The Superintendent's proof at the civil commitment trial was directed towards showing appellee's alleged dangerousness and his inability to care for himself without supervision. Appellee's wife testified that he had been hospitalized repeatedly in recent years, and that his March 1975 hospitalization was a direct result of his starting to attack her with a can opener. That stopped short of harm when appellee lapsed into a catatonic state. Police officers arrived to find him still in that condition, also having lost control of his bowels. Unable to draw appellee into conversation, they finally used Mace (so as to avoid injuring a man whom they recognized to be ill) in order to take away the can opener. Mrs. Lomax further testified that appellee often frightened her, and that he seriously neglected his physical appearance, slept clothed, stood and stared vacantly for long intervals, and persisted in eating foods which would endanger his health. He also chewed tobacco extensively, permitting the juice thereof to soil his person, clothing, and bedding.

Dr. Smothers, a clinical psychologist at Saint Elizabeths, gave expert testimony describing appellee's mental illness as catatonic schizophrenia and expressing his opinion that Lomax would be dangerous to himself if he were not committed. A physician from the hospital testified as to appellee's physical ailments, and gave his prognosis for appellee's deteriorating health should certain of his self-destructive habits continue unchecked. Lay witnesses also testified as to their observations of appellee's peculiar behavior. .

Appellee's trial counsel attempted to prove on cross-examination that both Mrs. Lomax and Dr. Smothers were biased in their beliefs as to the need for hospitalization. In addition, a social worker from the hospital testified concerning her impression —gained from visiting the Lomax household—that Mrs. Lomax encouraged her husband's dependency and treated him like a child. She also testified to appellee's ability to care for himself in the hospital.

The jury concluded that appellee should not be involuntarily committed because he was *not dangerous to himself or others.* The trial court then ordered appellee's release, D.C.Code 1973, § 21–545(b), but stayed the effectiveness of that order for 24 hours. A motions division of this court granted an interim stay pending this appeal, and later extended the stay after considering written submissions by the parties.[3]

---

pellee took an unauthorized leave. (During that period he displayed symptoms of catatonic schizophrenia.) He was readmitted in April 1968, and discharged in November 1972. He again was admitted to Saint Elizabeths in December 1973, and remained until February 1975. One month later, he was readmitted, but was released in June after a jury trial. He returned voluntarily, one day later, after he was unable to return to his former apartment which his wife had vacated. He was released in July. The confinement with which this proceeding is concerned commenced in August 1975.

2. Notwithstanding ,the vigor of our colleague's dissenting opinion, there is no dispute as to

the fact that appellee suffers from an acute mental illness. His able counsel's principal dissatisfaction with his treatment appears to arise from the fact that, for reasons not of record, a foster care home placement for him has not been achievable. That being the case, total freedom—which the record indicates appellee is not presently equipped to handle— or hospitalization are the available alternatives. (We have been advised informally, however, that appellee has received some periods of leave from the hospital since oral argument.)

3. The major portion of the dissent reflects disagreement with the earlier actions of the motions division in granting a stay, which

## II

Appellant maintains that our jurisdiction over this appeal is established by D.C.Code 1973, § 11–721(a)(1), which makes reviewable all final orders of the Superior Court. Appellant further contends that as a "party aggrieved" by the final order, he may appeal as a matter of right pursuant to § 11–721(b). Appellee challenges these assertions, contending that they are inconsistent with the legislative purpose of the Hospitalization of the Mentally Ill Act, violative of the patient's constitutional rights, and contrary to common sense. We do not find appellee's arguments persuasive.

■■■■ The Hospitalization of the Mentally Ill Act contains no provision concerning the right to appeal from either the grant or denial of a petition for judicial hospitalization.[4] Moreover, as this is not an appeal taken by the United States or the District of Columbia from an order entered in a criminal trial, it is not governed by D.C.Code 1973, § 23–104. Unless the very nature of the civil commitment provisions dictates that proceedings under them somehow are exempt from the broad scope of the review provisions of § 11–721, there is no statutory basis for concluding that this appeal is not permissible.

■■■■ Appellee contends that to grant the petitioner the right to challenge the release of the patient and seek a retrial of the issues is meaningless, since a civil commitment proceeding is concerned only with the current mental state of the patient, rather than with his condition at some fixed time in the past. We see no merit in this argument. The principles governing the use of the habeas corpus writ to secure

release from involuntary commitment provide a useful analogy. Confinement of the mentally ill does depend upon the current and continuing state of the patient's mental health. Thus, when a patient files a petition for release on habeas corpus, it is his present status, *i. e.*, whether he is currently mentally ill, which is at issue. *See Dixon v. Jacobs,* 138 U.S.App.D.C. 319, 327, 427 F.2d 589, 595 (1970). Although his mental condition often will be in a state of flux, *i. e.*, either deteriorating or responding to treatment, it cannot be argued that the government would have no right to appeal from an erroneous grant of a habeas corpus petition. If reversal is deemed necessary, additional evidence of the patient's current condition may be offered on remand. *See, e. g., Cameron v. Mullen,* 128 U.S.App.D.C. 235, 387 F.2d 193 (1967); *Overholser v. Russell,* 108 U.S.App.D.C. 400, 283 F.2d 195 (1960). Further, if the Superintendent's petition for commitment had been granted in this case and the patient then alleged that prejudicial error had been committed in the trial, the patient could not be denied the right to appeal simply because a retrial would be directed toward a temporally different mental condition than that which was at issue in the first proceeding. To accept such an argument would be in effect to eliminate all appeals from mental health proceedings.

It may well be that the petitioner cannot appeal from an adverse decision in a § 21–542 hearing before the Commission on Mental Health. The directive that the Commission "shall immediately order [respondent's] release," § 21–544, suggests that Congress intended no review of such an administrative decision, as the next step contemplated in the event of a decision against the petitioner is a trial in the Su-

---

continued appellee's emergency hospitalization pending the appeal. We deal with this subject in Part III of this opinion, *infra.*

4. As appellee points out, Super.Ct.Ment.H.R. 6(c), which provides for notification of the right to appeal from an adverse order in a civil commitment proceeding, mandates such

notification only to the respondent-patient. We do not think that this rule, directing to whom notification must be given, is dispositive of the question of who may appeal. The government may be presumed to be knowledgeable as to its legal remedies, while it is appropriate to require that a respondent be formally advised of his.

perior Court. *See* §§ 21–544 and –545. We need not reach this issue, however.

■ We construe § 11–721 as allowing review of a Superior Court decision after a § 21–545 hearing in which the respondent prevails. In such an event, the statute provides that "the court shall dismiss the petition and order his release." § 21–545(b). Assuredly that action is a final order or judgment of the sort which § 11–721(a) contemplates. Nothing in the commitment statutes indicates an exception to this general rule of reviewability.

■ We also conclude that the Superintendent is "aggrieved" by an adverse judgment in the trial court, and therefore is a proper party to appeal under § 11–721(a). Our precedents in juvenile cases show a common sense approach to the concept of an aggrieved party. For example, we have held that a child who has been ordered committed is aggrieved. *In re Sippy*, D.C.Mun.App., 97 A.2d 455, 458–59 (1953). We also have held that the government was aggrieved by the dismissal of a delinquency petition in view of its interest in the proper upbringing of children. *In re McDonald*, D.C.Mun.App., 153 A.2d 651, 656–57 (1959). [Although *Breed v. Jones*, 421 U.S. 519, 95 S.Ct. 1779, 44 L. Ed.2d 346 (1975), would now preclude such an appeal, it does not undermine *McDonald's* interpretation of the concept of an aggrieved party.] In this case, appellant was a party to the suit, lost it when the court dismissed the petition, and is an official of the government which has a significant interest in protecting the community from ill and dangerous persons, as well as in protecting such persons from injuring themselves.[5]

■ Similarly, we find no merit in appellee's suggestion that a retrial of the patient would violate the constitutional bar against double jeopardy. We are well aware that the interests at stake in an involuntary civil commitment proceeding are of transcendent proportions, and, regardless of the civil label which is affixed to such proceedings, we have seen fit to extend protections to them which normally are reserved for criminal adjudications. *See In re Hodges*, D.C.App., 325 A.2d 605 (1974); *In re Ballay*, 157 U.S.App.D.C. 59, 482 F.2d 648 (1973) (in involuntary civil commitment proceedings mental illness and dangerousness must be proven beyond a reasonable doubt). *Cf. Denton v. Commonwealth*, 383 S.W.2d 681 (Ky.1964). Nonetheless, it would strain both the language and the purpose of the double jeopardy guarantee to extend it to bar this appeal.[6]

■ The double jeopardy clause of the Fifth Amendment provides: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb. . . ." While we eschew reliance upon the labels of "civil" or "criminal", the nature of a mental health proceeding is fun-

---

5. It would be possible to make a narrower, hypertechnical interpretation of the concept of an aggrieved party, but we decline to do so. *See Application of Richmond County Society for the Prevention of Cruelty to Children*, 11 App.Div.2d 236, 204 N.Y.S.2d 707 (1960), *aff'd*, 9 N.Y.2d 913, 217 N.Y.S. 2d 86, 176 N.E.2d 97 (3 of 7 judges dissenting on this point), *appeal dismissed and cert. denied sub nom. Staten Island Mental Health Society, Inc. v. Richmond County Society for the Prevention of Cruelty to Children*, 368 U.S. 290, 82 S.Ct. 375, 7 L.Ed. 2d 336 (1961) (charity which unsuccessfully sought funds of another charity under the *cy pres* doctrine upon the latter's dissolution

was not aggrieved by the judgment and therefore could not appeal).

6. The double jeopardy clause is directed against multiple criminal prosecutions, not against government appeals. *United States v. Wilson*, 420 U.S. 332, 342, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975). However, within such a context, where a government appeal would require a new trial if successful, it is that clause which acts as the constitutional impediment to the initiation of appellate review by the government. *See United States v. Jenkins*, 420 U.S. 358, 369, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975).

damentally distinguishable from the type of action to which the double jeopardy bar applies. The notion underlying the prohibition against double jeopardy is that an individual should not be twice tried or convicted for the same offense. *See United States v. Wilson,* 420 U.S. 332, 339, 95 S. Ct. 1013, 43 L.Ed.2d 232 (1975). A person alleged to be mentally ill is not on trial for having committed an "offense", and we do not view civil commitment—aimed basically at treatment for the afflicted individual —as comparable to punishment for the conviction of a crime.

Appellee argues that a mental health proceeding is analogous to a juvenile delinquency hearing, and that *Breed v. Jones, supra,* bars this appeal. In *Breed,* the Supreme Court held that a juvenile is put in jeopardy "at a proceeding whose object is to determine whether he has committed acts that violate a criminal law and whose potential consequences include both the stigma inherent in such a determination and the deprivation of liberty for many years." 421 U.S. at 529, 95 S.Ct. at 1785.

Appellee's reliance on *Breed* is misplaced. The Supreme Court's decisions extending constitutional procedural rights to juveniles charged with offenses reflect an awareness of the similarity between juvenile delinquency determinations and adult criminal convictions. *Breed v. Jones, supra,* at 528–31, 95 S.Ct. 1779; *In re Winship,* 397 U.S. 358, 366–67, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *id.* at 374, 90 S.Ct. 1068. (Harlan, J., concurring); *In re Gault,* 387 U.S. 1, 22–24, 27–29, 36, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). *See also In re M. W. F.,* D.C.App., 312 A.2d 302, 302–04 (1973) (Harris, J., dissenting).

▉▉▉▉ The purpose of a civil commitment proceeding is not to decide whether a person has engaged in legislatively condemned conduct, but to determine whether

he is mentally ill and likely to be a danger to himself or others. D.C.Code 1973, § 21–545(b). Of course, as a matter of constitutional prohibition, Congress could not make mental illness a crime. *See Robinson v. California,* 370 U.S. 660, 666–67, 82 S. Ct. 1417, 8 L.Ed.2d 758 (1962) (statute making narcotic addiction a crime contravenes the Cruel and Unusual Punishment Clause); *cf. Powell v. Texas,* 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968). Although criminal prosecutions, delinquency adjudications, and commitment proceedings all may result in the loss of liberty, "an interest of transcendent value", *Speiser v. Randall,* 357 U.S. 513, 525, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958), there are obvious distinctions between a determination that a person is mentally ill and likely to endanger himself or others on the one hand, and a criminal conviction or a delinquency determination on the other.

▉▉▉▉ The double jeopardy clause was meant to prohibit repeated attempts by the state to convict a defendant, thereby protecting him from harassment, expense, and ordeal. *See Green v. United States,* 355 U.S. 184, 187–88, 78 S.Ct. 221, 2 L.Ed. 2d 199 (1957). However, as appellee concedes, there is nothing in the Act which prevents the hospital from repeatedly filing new petitions for judicial hospitalization whenever it perceives that a person's mental condition warrants confinement.[7] Thus, to preclude government appeals on the basis of the double jeopardy guarantee would fail to protect the interests which that guarantee was designed to secure, further indicating the inapplicability of that safeguard to proceedings of this nature.

▉▉▉▉ Additionally, appellee argues that to allow this appeal would betray the legislative design of the Hospitalization of the Mentally Ill Act by frustrating the policy of expedited proceedings. We fail to see

---

7. We recognize that the repetitious commencement of proceedings might reach a level of oppressiveness which would be violative of due process rights. *See Gomes v. Gaughan,* 471 F.2d 794, 797 (1st Cir. 1973); *People v. Sansone,* 18 Ill.App.3d 315, 309 N.E.2d 733, 742 (1974).

how a single, orderly appeal taken to vindicate the considerable private and public interests with which the superintendent is entrusted could vitiate the purposes of the Act. An appeal from what the government perceives to be a flawed jury trial is preferable to reinstitution of the entire judicial hospitalization process. The substantial public interest in fair trials cannot tolerate a complete insulation of these proceedings from review in those cases in which the outcome favors the patient. *See Illinois v. Somerville,* 410 U.S. 458, 469–70, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973); *United States v. Jorn,* 400 U.S. 470, 480, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971).

As we find no statutory, constitutional, or policy grounds which would operate to defeat our jurisdiction over this appeal pursuant to the broad authority bestowed by § 11–721, we hold that this court is both empowered and obligated to review appellant's contentions on the merits.

### III

Before reaching the substance of the appeal, however, we comment upon the existing stay order which is so vigorously challenged by our dissenting colleague.[8]

 The propriety of a stay pending an appeal depends upon four factors: (1) whether the movant is likely to prevail on the merits of the appeal; (2) whether a denial of the stay would irreparably injure the movant; (3) whether a stay would substantially harm other parties interested in the proceeding; and (4) whether the stay would be in the public interest. *Virginia Petroleum Jobbers Association v. Federal Power Commission,* 104 U.S.App. D.C. 106, 110, 259 F.2d 921, 925 (1958).

 As we do reverse, it is obvious that there was a strong likelihood that appellant would prevail in this court. Whether or not appellant himself would be

irreparably injured, a denial of the stay would have presented a risk of substantial harm to appellee's wife. Appellee previously had attacked her, with the recent assault stopping only when he fell into a catatonic trance. The stay also undoubtedly benefitted appellee himself; assuredly he has received sorely-needed medical attention during the existence of the stay. The public interest also called for a stay, in light of the possibility that appellee might attack persons other than his wife.

 We do not regard the stay as unconstitutional. In *Gerstein v. Pugh,* 420 U.S. 103, 120–23, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), the Court ruled that the government could jail persons before criminal trials merely upon a nonadversarial showing of probable cause. The Mental Health Commission hearing conducted under §§ 21–542(a) and 21–543 contains greater procedural protections, and permits detention only upon a finding that the respondent is mentally ill and likely to endanger himself or others. In this noncriminal context, the Commission's findings certainly are adequate from a constitutional standpoint to justify detention pending an appeal as well as before a trial. *Cf. Kendall v. True,* 391 F.Supp. 413, 420 (W.D.Ky.1975) (petition alleging probable cause that respondent is dangerous to himself or others and that he lacks the capacity to authorize his own hospitalization is a constitutionally adequate basis for detention before a hearing).

There is, in addition, ample precedent for staying the release of persons who have been declared improperly confined while the adverse party takes an appeal. In *Breed v. Jones, supra,* 421 U.S. at 541, 95 S.Ct. 1779, the Supreme Court made no objection to the Ninth Circuit's stay of its order granting a writ of habeas corpus. The United States Court of Appeals for this circuit similarly has stayed the release of a person it held to have been wrongful-

---

8. After the stay had been granted (by another division of the court), a motion for reconsideration thereof was filed. This decision moots that pending motion.

ly committed. *United States v. Wright,* 167 U.S.App.D.C. 309, 313, 511 F.2d 1311, 1315 (1975). The Second Circuit has stayed the release on bail of habeas corpus petitioners pending the state's appeal from a District Court decision granting the writ. *United States ex rel. Rice v. Vincent,* 486 F.2d 215 (2d Cir. 1973). The instant stay presents no due process problem.[9]

█ Nor does the stay deny equal protection. A stay of release potentially would be available in any commitment proceeding under the Hospitalization of the Mentally Ill Act if the *Virginia Petroleum Jobbers Association* criteria are satisfied. The case therefore has no similarity to *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), or *Baxstrom v. Herold,* 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966), both of which invalidated procedural differences in handling separate classes of persons institutionalized for mental illness. The constitutional question in *Humphrey v. Cady,* 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972), which the Court found substantial enough to warrant an evidentiary hearing, likewise involved procedural discriminations against one class of involuntarily committed persons.

## IV

█ We turn now to the ultimate merits of the appeal. In her opening statement to the jury, appellee's trial counsel made three representations which appellant claims improperly influenced the jury and necessitated granting the immediate motion for a mistrial. She first stated that the anticipated testimony of the social worker would reveal that Mrs. Lomax had self-serving motives. Appellant objected that any such testimony would be both hearsay and the opinion of a lay witness, and therefore would be inadmissible. We find no impropriety in this aspect of the opening statement. The social worker, though not qualified by the court as an expert in intrafamily dynamics was permitted to describe some of the interaction between appellee and his wife and to state her impressions of their relationship. The outline of the expected proof on this point varied little from the testimony presented and did not exceed the scope of proper opening remarks. *Cf. Frazier v. Cupp,* 394 U.S. 731, 736, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) ; *United States v. West,* 486 F.2d 468, 471– 72 (6th Cir. 1973), *cert. denied,* 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305 (1974). *See also Robinson v. United States,* D.C. App., 361 A.2d 199, 200 (1976).

█ On the other hand, the two additional disputed comments were improper, and one called for granting the requested mistrial. In the course of her opening statement, counsel asserted that appellee's proof would show that he had been tried by a jury some months before in another mental health proceeding and that there the jury had concluded that appellee did not present a danger to himself or to others. Counsel additionally stated that Dr. Smothers, the hospital's expert witness, was "chagrined" at having failed to secure appellee's involuntary commitment in that prior trial, and that his persistence in seek-

---

9. A number of cases recently have discussed the due process requirements for commitment proceedings. *Compare, e. g., Doremus v. Farrell,* 402 F.Supp. 509 (D.Neb.1975) ; *Bartley v. Kremens,* 402 F.Supp. 1039 (E.D.Pa. 1975) ; *prob. juris. noted,* 424 U.S. 964, 96 S.Ct. 1457, 47 L.Ed.2d 731 (1976) ; *Kendall v. True, supra, Lynch v. Baxley,* 386 F.Supp. 378 (M.D.Ala.1974) ; *Bell v. Wayne County General Hospital,* 384 F.Supp. 1085 (E.D.Mich.1974), and *Lessard v. Schmidt,* 349 F.Supp. 1078 (E.D.Wis.1972), *vacated and remanded on other grounds,* 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974), *on remand,* 379 F.Supp. 1376, *vacated and remanded on other grounds,* 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975), *with Logan v. Arafeh,* 346 F.Supp. 1265 (D.Conn. 1972), *aff'd,* 411 U.S. 911, 93 S.Ct. 1556, 36 L.Ed.2d 304 (1973). *See Humphrey v. Cady,* 405 U.S. 504, 510–12, 92 S.Ct. 1048, 31 L.Ed. 2d 394 (1972). They do not, however, consider the question of appellate review which is before us. *Cf.* Annot. 34 A.L.R.3d 652, § 17 at 705 (1970) (involving sexual psychopath proceedings).

ing appellee's hospitalization was the result of his desire to have more control over appellee than was necessary. We have found nothing in the record on which such an argument impugning the motives of the doctor rationally could have been based, and thus we find these statements to be unsupported and unwarranted allegations of bias. *See United States v. Jones,* 140 U.S.App. D.C. 1, 2 n. 5, 433 F.2d 1107, 1108 n. 5 (1970); *Johnson v. United States,* 121 U. S.App.D.C. 19, 21, 347 F.2d 803, 805 (1965). However, as the court gave a subsequent cautionary instruction which warned the jurors of the limited nature of opening argument, we would not reverse on the basis of those remarks alone.

However, counsel's references to the prior civil commitment proceeding and to the jury's verdict in that trial were so clearly without probative value, and so patently designed to sway the jury, that they constituted grounds for a mistrial. There is no purpose for which evidence of the earlier jury's conclusions on appellee's past state of mental health would have been admissible in the instant case. The second jury was concerned exclusively with appellee's current suitability for involuntary hospitalization. Counsel's introduction of the prior finding in favor of appellee could have served only to confuse and mislead the jurors into surmising that such a finding had a bearing on their task.

 Appellee attempts to minimize the impropriety of those remarks by arguing that a separate reference to the prior trial subsequently was made by one of the hospital's own witnesses, and that the court's cautionary instruction eliminated any possible prejudice. While a government witness did make passing mention of the prior jury trial, the two instances are not comparable or offsetting. The witness' remark was inadvertent. He did not discuss the substance of the prior verdict, and his comment followed counsel's improper statements. In contrast, counsel's opening statement had represented the earlier verdict as an element of importance to appellee's case. We are not confronted, as was the court in *Carsey v. United States,* 129 U.S.App.D.C. 205, 392 F.2d 810 (1967), with an offhand mention of the mere existence of a previous trial. Instead, appellee's counsel invited the jury to credit this irrelevant and highly influential information in assessing appellee's current mental condition. We have no doubt but that had the government alluded to a previous proceeding in which appellee had been adjudged mentally ill and dangerous, and encouraged the jury to take note of that fact, appellee's counsel properly would cite such conduct as grounds for a mistrial.[10] A patient's attorney is not free to follow a more lenient standard of conduct. *Cf. Carsey v. United States, supra,* at 213–14, 392 F.2d at 818–19 (Tamm, J., dissenting).

The trial court's cautionary instruction which was given at the close of appellee's opening statement did not cure the jury's exposure to the improper remarks. The court simply admonished the jury that opening statements are not evidence and that "arguments of counsel are just that". This charge was inadequate to inform the jurors of the incompetence of the "evidence" which was revealed or of their consequent obligation to disregard it. We conclude that the second jury was irreparably influenced by its knowledge of the first jury's verdict. The remarks were directed improperly toward influencing the jury's deliberations on the ultimate issue in the proceeding, *i. e.,* appellee's present dangerousness to himself or others, and hence cannot be held to be harmless. Accordingly, the judgment is reversed and the case is remanded for a new trial.[11]

*Reversed and remanded.*

---

10. *See Carsey v. United States, supra,* at 212, 392 F.2d at 817–18 (Tamm, J., dissenting).

11. The new trial should be held at the earliest feasible time, since appellee may continue to be hospitalized pending its completion.

MACK, Associate Judge, dissenting:

On two separate occasions in 1975, a jury found that respondent Lomax, while mentally ill, was not a danger to himself or others, and a court ordered him released from Saint Elizabeths Hospital. Petitioner, the Acting Superintendent of the Hospital, speaking through his representative, the United States Attorney, has asked this court to insure the continued confinement of Mr. Lomax, to reverse the last order of release, and to remand for a new trial. Through the tortuous process of rejecting the respondent's position, the majority opinion holds that the government has a right of appeal in an involuntary commitment proceeding pursuant to the District of Columbia Hospitalization of the Mentally Ill Act (the Act).[1] Having thus cleared the way for reversal of the release order, it holds that the trial court was required to declare a mistrial in response to certain remarks made by respondent's counsel in the course of her opening statement. Finally and most importantly, it decides that pending resolution of the appeal and now retrial,[2] respondent may be confined involuntarily at Saint Elizabeths Hospital. I find these conclusions to be unjustified and disturbing.

## I.

I turn first to the matter of the stay, because that is the authority under which Mr. Lomax is confined against his will at St. Elizabeths Hospital. Moreover, despite the rather cursory treatment given the stay by the majority,[3] the facts and considerations relative thereto go to the heart of the reasons why the government has no right of appeal.

On December 17, 1975, a jury found that Mr. Lomax *was* mentally ill but *was not* likely to injure himself or others as a result of that illness if allowed to remain at liberty. The following day,[4] the trial court ordered respondent's immediate release from the Hospital, pursuant to D.C.Code 1973, § 21–545(b). The government expressed its intention to appeal the jury verdict and the release order, and requested a stay of the order of release pending appeal. The trial judge denied the request. He did, however, delay the order for twenty-four hours to give the government time to seek a stay from this court, noting, *inter alia:*

> So, unless we are going to assume a paternalistic type of Government, and if we do that we have to scrap the Constitution, . . . you can't deprive a person of life, liberty or property without due process of law. It is the Fifth Amendment which is directly effective on us, here. So I can't deprive this man of his liberty one minute more than he should be deprived of it.

> I certainly won't give a ten day [s]tay. I'll give you 24 hours to get to the Court of Appeals. I'll stay it for 24 hours. I am reluctant to do that . . . .

On December 19, 1975, the United States Attorney filed in this court a notice of appeal and a motion for a stay pending appeal. The Motions Division ordered that the effectiveness of the trial court's release order would be stayed pending further order of this court, following the filing of a response to the motion for a stay. The temporary stay remained in effect until January 21, 1976, when this court, without opinion, granted the government's motion

---

1. Pub.L.No.88–597, 78 Stat. 944 (1964), *revised and codified.* Pub.L.No.89–183, 79 Stat. 751 (1965), *codified* at D.C.Code 1973, § 21–501 *et seq.*

2. *See* note 11 of the majority opinion.

3. The majority supports the stay by references to traditional criteria set forth in civil cases having nothing to do with commitment. *See*

*Virginia Petroleum Jobbers Assoc. v. Federal Power Comm'n,* 104 U.S.App.D.C. 106, 110, 259 F.2d 921, 925 (1958).

4. Another judge took the verdict in the trial judge's absence on the 17th but deferred the question of release to the trial judge, who returned the next day.

for a stay pending the outcome of this appeal. On March 22, 1976, respondent filed in this court a motion to reconsider the stay, attaching thereto a copy of a petition for writ of habeas corpus and supporting memorandum filed in the United States District Court on February 18, 1976, thus for the first time fully setting forth constitutional objections to his continued confinement.[5]

I believe that the stay was improvidently granted by this court, and I agree with Mr. Lomax that his continued confinement deprives him of his Fifth Amendment rights to substantive and procedural due process and equal protection of the laws.[6]

It seems to me that the due process clause means very little if it does not bar the unauthorized deprivation of liberty at issue here. Lawful authority for the involuntary confinement of Mr. Lomax ceased when the jury returned its verdict and the trial court ordered his release. Until that time, respondent's confinement had been pursuant to the standards and procedures set forth in the Act.[7] Respondent *should* have been released pursuant to those standards and procedures, and he *would* have been released, but for the action of this court, which I find impossible to justify on either constitutional or statutory grounds.

It can no longer be doubted that involuntary commitment to a mental hospital is a deprivation of liberty which cannot be accomplished without due process of law. *O'Connor v. Donaldson,* 422 U.S. 563, 580, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) (Burger, C. J., concurring); *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L. Ed.2d 435 (1972); *In re Ballay,* 157 U.S. App.D.C. 59, 66, 482 F.2d 648, 655 (1973). Due process considerations are not solely procedural, but involve as well the substantive constitutional limitations on the power to commit. While the constitutional parameters of that power have not been definitively traced, this much is clear: "Commitment must be justified on the basis of a legitimate state interest. . . ." *O'Connor v. Donaldson, supra* 422 U.S. at 580, 95 S.Ct. at 2496.

The interests generally advanced under contemporary statutes as justification for involuntary commitment of mentally ill persons are the prevention of injury to the public, prevention of injury to the patient, and the need for care or treatment or

---

5. We have been informed that the District Court denied Mr. Lomax's petition for a writ of habeas corpus on the sole ground that he had not yet exhausted his available remedies because he had not presented certain of his constitutional arguments to this court. He has now done so.

 The majority today rejects those arguments and in effect denies the motion to reconsider (and lift) the stay. *See* note 8 of the majority opinion.

6. "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 670, 46 L. Ed.2d 659 (1976), *citing Weinberger v. Wiesenfeld,* 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975).

 Because of my view of the due process issues, I see no need to discuss the merits of the equal protection argument.

7. D.C.Code 1973, § 21–501 *et seq.* Thus, respondent was admitted to St. Elizabeths on August 25, 1975, on an involuntary basis (§§ 21–521 and –522). On August 27, respondent's continued hospitalization for emergency observation was authorized by court order (§ 21–523). On September 3, 1975, a petition for respondent's judicial hospitalization (civil commitment) was filed (§ 21–541). That filing triggered the applicability of § 21–528, pursuant to which a Superior Court judge ordered respondent's continued detention, also on September 3. On September 18, the Mental Health Commission held a hearing (§ 21–542). After two continuances to give the Hospital an opportunity to place Mr. Lomax in a foster home, the Commission concluded it could delay no longer and, on November 13, 1975, recommended respondent's commitment for an indefinite period (§ 21–544). Mr. Lomax then requested a jury trial (§§ 21–544 and –545(a)). Following the jury verdict, the trial court on December 18, 1975, dismissed the petition and ordered respondent's release, as it was required to do (§ 21–545(b)).

training.[8] *O'Connor v. Donaldson, supra* at 573–74, 95 S.Ct. 2486; *Jackson v. Indiana, supra* 406 U.S. at 737, 92 S.Ct. 1845; *Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972). *See generally Developments in the Law: Civil Commitment of the Mentally Ill,* 87 Harv. L.Rev. 1190 (1974).

In the District of Columbia, the substantive limitations on the power to commit mentally ill persons are clearly defined in the Act. Congress has decreed that in this jurisdiction, civil commitment is justified *only* when the person is "mentally ill *and,* because of that illness, is likely to injure himself or other persons if allowed to remain at liberty." [9] The jury here found that such commitment was not justified, and there is evidence supporting such a finding. Apart from the conceded mental illness of respondent, the evidence generally pictured a man with physical ailments, human frailities and a wife who was either unable or unwilling to be his caretaker.[10]

---

8. Although the issue is not before us, because of the Act's narrow definition of the committable class, I note that there is considerable doubt about the constitutionality of statutes which permit involuntary commitment solely on the ground of mental illness and with no finding of dangerousness to self or others. This view is implicit in the Supreme Court's construction of statutes in *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), and *Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972). Recently, a number of courts have expressly so held. *Stamus v. Leonhardt,* 414 F.Supp. 439, 450–51 (S.D.Iowa 1976); *Suzuki v. Quisenberry,* 411 F.Supp. 1113, 1124–25 (D.Hawaii 1976); *Doremus v. Farrell,* 407 F.Supp. 509, 513–15, 517 (D.Neb.1975) (three-judge court); *Kendall v. True,* 391 F. Supp. 413, 418–19 (W.D.Ky.1975) (three-judge court); *Lynch v. Baxley,* 386 F.Supp. 378, 389–92 (M.D.Ala.1974) (three-judge court); *Bell v. Wayne County Gen. Hosp.,* 384 F.Supp. 1085, 1096 (E.D.Mich.1974) (three-judge court); *Lessard v. Schmidt,* 349 F.Supp. 1078 (E.D.Wis.1972) (three-judge court), *vacated and remanded on other grounds,* 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed. 2d 661 *on remand,* 379 F.Supp. 1376 (D.C. Wis.1974), *vacated and remanded on other grounds,* 421 U.S. 959, 95 S.Ct. 1943, 44 L. Ed.2d 445 (1975), *judgment reinstated on remand,* 413 F.Supp. 1318, 19 Crim.L.Rep. 2260 (E.D.Wis. May 28, 1976); *State v. Krol,* 68 N.J. 236, 344 A.2d 289 (1975); *In re Levias,* 83 Wash.2d 253, 517 P.2d 588 (1973); *State ex rel. Hawks v. Lazaro,* 202 S.E.2d 109, 123 (W.Va.1974); *but see Fhagen v. Miller,* 29 N.Y.2d 348, 328 N.Y.S. 2d 393, 278 N.E.2d 615, *cert. denied,* 409 U.S. 845, 93 S.Ct. 47, 34 L.Ed.2d 85 (1972). Evidently the confinement of the mentally ill for their own protection (as opposed to solely on the ground of prevention of injury to others) was not widespread in this country until a century ago. This use of the *parens patriae* power then gained currency, but not without limitation. The Supreme Judicial Court of Massachusetts described this limitation on the state's power in *Matter of Josiah Oakes,* 8 Law Rep. 123, 125 (Mass. 1845):

> [T]he right to restrain an insane person of his liberty is found in that great law of humanity, which makes it necessary to confine those whose going at large would be dangerous to themselves or others . . .
> And the necessity which creates the law, creates the limitation of the law. The questions must then arise in each particular case, whether a patient's own safety, or that of others, requires that he should be restrained for a certain time, and whether restraint is necessary for his restoration or will be conducive thereto. The restraint can continue as long as the necessity continues. This is the limitation, and the proper limitation.

9. D.C.Code 1973, § 21–545(b) (emphasis added).

10. A medical doctor testified at trial that respondent's neglect of his physical well-being might well prove fatal—in ten to fifteen years. (Mr. Lomax is now 52 years old.) Petitioner's evidence also indicated that respondent stands for long periods of time and that he likes to consume large quantities of salt, both of which habits exacerbate the edema in his legs and feet; that he fails to take his medication; that he chews copious amounts of tobacco and the tobacco juice contributes to his unsightly appearance; that he stares for long periods at nothing in particular and is sometimes mute; and that he voluntarily returned to St. Elizabeths once after another jury had found, as this one did, that he is not committable under the statute.

As for potential danger to others, the majority opinion emphasizes respondent's "attack" on his wife with a can opener. This so-called "assault" occurred in March 1975,

It is interesting to note that the trial court shared the reaction of the jury to such evidence.[11]

I have no doubt that petitioner and the medical experts who testified at trial in favor of the petition share a genuine and good faith belief that Mr. Lomax's best interests would be served by involuntary commitment.[12] Clearly they disagree with the jury's determination that Mr. Lomax is not committable.[13] However, neither the opinion of medical experts nor the order of this court constitutes statutory authority for the indefinite confinement of Mr. Lomax. Under the Act, that determination can only be made by the trial court or, as in this case, by the jury.

The significance of the jury's role in such proceedings has been described by the Supreme Court in *Humphrey v. Cady, supra* 405 U.S. at 509, 92 S.Ct. at 1052:

> Like most, if not all, other States with similar legislation, Wisconsin conditions such confinement not solely on the medical judgment that the defendant is mentally ill and treatable, but also on the so-

cial and legal judgment that his potential for doing harm, to himself or to others, is great enough to justify such a massive curtailment of liberty. In making this determination, the jury serves the critical function of introducing into the process a lay judgment, reflecting values generally held in the community, concerning the kinds of potential harm that justify the State in confining a person for compulsory treatment. [Footnotes omitted.]

This jury concluded—as did the one before it—that respondent's potential for doing harm was *not* sufficiently great to justify "such a massive curtailment of liberty." In sanctioning continued confinement, this court has, in effect, reversed that verdict. This is a denial of substantive due process.

The validity of the stay fares no better in a procedural due process analysis. Even assuming, *arguendo,* that there is a legitimate state interest which justifies depriving respondent of his liberty, it is, nonetheless, unconstitutional to achieve it in the manner chosen here. Respondent has been

---

prior to the first jury trial, when, after an altercation with his wife, respondent lapsed into a catatonic state. His wife's testimony is instructive:

> Q. [By Counsel for Mr. Lomax]: I understand that, Mrs. Lomax, but at that time did he threaten you with the can opener?
> A. No; and it's a funny thing . . . .
> Q. But he didn't threaten you, did he?
> A. I didn't say that he threatened me either times. No, I didn't say that he did.

11. The trial judge expressed his agreement with the jury verdict in this case:

> . . . I feel, sitting as a 13th juror, that I would have voted along with the other 12, that I don't think he is harmful to others and I don't think on the evidence adduced that we could say he was harmful to himself, really.

12. I note that a common thread running throughout the majority opinion is the notion that respondent is entitled to fewer substantive and procedural rights than a criminal defendant or juvenile delinquent because the government seeks not to punish but to help

him. This theory is a familiar one, and it has been repudiated repeatedly, as courts have come to realize that "[l]imiting a person's constitutional rights on the theory that it is in his best interests is questionable philosophy and bad law." *Suzuki v. Quisenberry, supra* note 8, at 1130. *See In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *In re Gault,* 387 U.S. 1 (1967); *Heryford v. Parker,* 396 F.2d 393 (10th Cir. 1968); *Doremus v. Farrell, supra* note 8, at 513; *Bartley v. Kremens,* 402 F.Supp. 1039, 1045–46 (E.D.Pa.1975) (three-judge court), *prob. juris. noted,* 424 U.S. 964, 96 S.Ct. 1457, 47 L.Ed.2d 731 (1976).

13. Conflicting medical and lay opinions on this question are not new. In Wisconsin, where juries have been relied on since 1880 to decide whether to confine a person for compulsory psychiatric treatment, periodic efforts have been made to eliminate the jury trial provision because "juries too often [refuse] to order commitment when the medical experts . . . [think] it appropriate." *Humphrey v. Cady, supra* note 8, 405 U.S. at 509 n. 5, 92 S.Ct. at 1052.

held twelve months, with no hearing, no statement of reasons, pursuant to no standards, and for an indefinite period.

While the concept of due process is a flexible one, it seems elementary that there is a denial of due process when a person is committed or held without a hearing. An individual is entitled to a hearing before he is deprived of any significant property interest.[14] Certainly an individual's interest in his personal liberty—the freedom to come and go as he chooses, and the right to be let alone [15]—is more precious than any property. Mr. Lomax has been denied that freedom, contrary to established law.[16]

The majority opinion suggests that respondent's continued detention is justified constitutionally because the Mental Health Commission hearing and findings more than satisfy the probable cause requirement of *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct.

854, 43 L.Ed.2d 54 (1975). To the extent that I find *Gerstein* relevant, it is supportive of respondent's position.[17] What *Gerstein* requires is not a hearing per se but a timely judicial determination of probable cause as a prerequisite to detention. *Id.* at 119–26, 95 S.Ct. 854. The Act, of course, requires no less. D.C.Code 1973, §§ 21–523–525; *In re Barnard*, 147 U.S.App. D.C. 302, 305–306, 455 F.2d 1370, 1373–74 (1971).

Surely my colleagues, by reliance on *Gerstein*, do not mean to suggest that the due process safeguards surrounding respondent's initial confinement (that is, the judicial determination of probable cause which justified his detention pending trial) can also justify his post-trial detention. "[D]ue process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jack-*

14. *Fuentes v. Shevin*, 407 U.S. 67, 80–81, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Boddie v. Connecticut*, 401 U.S. 371, 377–80, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

15. The only freedom which deserves the name, is that of pursuing our own way, so long as we do not attempt to deprive others of theirs, or impede their efforts to obtain it. Each is the proper guardian of his own health, whether bodily, or mental and spiritual. Mankind are greater gainers by suffering each other to live as seems good to themselves, than by compelling each to live as seems good to the rest. [John Stuart Mill, on Liberty, 18 (Gateway ed. 1962).]

16. *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); *McNeil v. Director, Patuxent Institution*, 407 U.S. 245, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972); *Humphrey v. Cady*, supra note 8; *In re Gault*, supra note 12; *Specht v. Patterson*, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed. 2d 326 (1967); *Sebastian v. United States*, 531 F.2d 900, 903 (8th Cir. 1976); *In re Barnard*, 147 U.S.App.D.C. 302, 455 F.2d

1370 (1971); *Stamus v. Leonhardt*, supra note 8, at 446; *Suzuki v. Quisenberry*, supra note 8, at 1127; *Doremus v. Farrell*, supra note 8, at 515–17; *Meisel v. Kremens*, 405 F.Supp. 1253 (E.D.Pa.1975); *Saville v. Treadway*, 404 F.Supp. 430, 432 (M.D.Tenn. 1974) (three-judge court); *Bartley v. Kremens*, supra note 12, at 1049, 1053; *Kendall v. True*, supra note 8, at 419; *Lynch v. Baxley*, supra note 8, at 387–88; *Bell v. Wayne County Gen. Hosp.*, supra note 8, at 1097, 1102; *Lessard v. Schmidt*, supra note 8; *Dixon v. Attorney General*, 325 F.Supp. 966 (M.D.Pa.1971) (three-judge court).

17. *Gerstein* involved pretrial detention of a criminal defendant. The Supreme Court held that the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest and prior to trial. Respondent is not challenging his pretrial confinement, since it was in accord with the standards and procedures of the Act, which already guarantee to respondent the right secured in *Gerstein*. *In re Barnard*, supra note 16. What is at issue is this court's post-trial stay. *Gerstein*, therefore, in fact supports respondent's claim that his present confinement is illegal, since he has been held since his trial without the requisite judicial determination of probable cause.

*son v. Indiana, supra,* 406 U.S. at 738, 92 S.Ct. at 1858. Thus, if the commitment is a short term confinement with a limited purpose, lesser safeguards may be appropriate, but then the duration of the confinement must be strictly limited. Where the commitment is permanent in its practical effect, it requires safeguards commensurate with a long term commitment. *Id.* at 723–38, 92 S.Ct. 1845. "A confinement that is in fact indeterminate cannot rest on procedures designed to authorize a brief period of observation." *McNeil v. Director, Patuxent Institution,* 407 U.S. 245, 249, 92 S.Ct. 2083, 2087, 32 L.Ed.2d 719 (1972).

Clearly, then, petitioner could not lawfully have confined respondent indefinitely, and without a trial, solely on the basis of the emergency admission or temporary commitment. It follows also that his posttrial confinement cannot be justified on the basis of the temporary commitment, since the purpose of that short term detention was to determine respondent's need for judicial commitment, and that purpose was served when the jury returned its verdict.

Just as emergency detention is justified only until a probable cause hearing can be conducted, temporary detention following a finding of probable cause to believe that confinement is necessary can

be justified only for the length of time required to arrange a full hearing on the need for commitment.[18]

Although respondent's involuntary commitment was initially permissible, it could not constitutionally continue after that basis no longer existed.[19] *O'Connor v. Donaldson, supra,* 422 U.S. at 575, 95 S.Ct. 2486; *Jackson v. Indiana, supra,* 406 U.S. at 738, 92 S.Ct. 1845; *McNeil v. Director, Patuxent Institution, supra.* Thus the stay ordered by this court operated as a new commitment, and in my opinion its constitutionality fails.

## II.

I would therefore dismiss this appeal and hold that the petitioner in a civil commitment proceeding has no right to appeal from a verdict in favor of the respondent. In my opinion, no other conclusion is possible in view of the design and intent of the Act. Keeping in mind that "[a] statute sanctioning such a drastic curtailment of the rights of citizens must be narrowly, even grudgingly, construed," [20] it is significant that the Act does not provide, nor even suggest, that a petitioner in such a proceeding might appeal. Significantly also, the applicable Rules mention only an appeal by the respondent. Super.Ct.Ment.

---

18. *Lynch v. Baxley, supra* note 8, at 388. *See also Doremus v. Farrell, supra* note 8, at 515; *Bartley v. Kremens, supra* note 12, at 1049; *Bell v. Wayne County Gen. Hosp., supra* note 8, at 1097–99, 1102; *Lessard v. Schmidt, supra* note 8, at 1091.

19. There is, of course, as the majority notes, no lack of precedent for continuing confinement pending final resolution of appeals, even after one court has declared the challenged confinement illegal. In all of these cases, however, there has first been a judicial finding that ,the person committed a criminal act or was committable under a statutory standard. Of the cases cited by the majority, *Breed v. Jones,* 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed. 2d 346 (1975), for example, involved an individual convicted of robbery. The appellant in *United States v. Wright,* 167 U.S. App.D.C. 309, 511 F.2d 1311 (1975), was convicted by a jury of destruction of govern-

ment property and thereafter found not guilty by reason of insanity. In *United States ex rel. Rice v. Vincent,* 486 F.2d 215 (2d Cir. 1973), the court of appeals stayed an order of release pending appeal by the government of a grant of a writ of habeas corpus; the prisoner was serving a life sentence for first-degree murder, attempted murder and attempted robbery, and ,the appellate court was concerned that he might flee.

This case is fundamentally distinguishable, since here, the individual has been found not to be committable. This distinction forms the crux of this case. The majority has failed to cite any precedent for staying the release of a person whom the factfinder has found to be *not* guilty or *not* committable, while the government takes an appeal.

20. *Covington v. Harris,* 136 U.S.App.D.C. 35, 41, 419 F.2d 617, 623 (1969).

H.R. 6(c). Furthermore, it is not necessary to imply such a right to further the purposes of the statute; quite the contrary. As respondent suggests, common sense dictates that it is meaningless to infer a right to appeal and, if successful, to retry the patient, since at trial, it is always the patient's *current* mental status which is at issue.[21] As the majority recognizes, nothing prevents the petitioner from bringing a new petition to commit the patient whenever such action is warranted by his mental condition. Thus the only discernible governmental interest in an appeal is to continue the confinement of the respondent. Yet the mandatory language of Section 21–545(b) requires his release. Continued confinement subverts that legislative mandate.

I am unpersuaded by petitioner's claim, accepted by the majority, that D.C.Code 1973, § 11–721, is applicable to proceedings under the Act. I fail to see how the Superintendent of Saint Elizabeths Hospital is "aggrieved" by an order to release a patient who has been found by a jury not to be properly committable under the terms of the Act. The majority, drawing from precedents in juvenile delinquency proceedings as to who is an aggrieved party, correctly observes that *Breed v. Jones*, 421 U. S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975), would now preclude an appeal by the government in such cases. It goes on to argue that there are obvious distinctions between juvenile delinquency proceedings and mental health proceedings, but we are left wondering what those distinctions are. At least in this jurisdiction, the distinctions are without true significance, since in both, the interest in liberty is at stake. *In re Hodges*, D.C.App., 325 A.2d 605 (1974); *In re Ballay, supra* at 79–80, 482 F.2d at 668–69.

I am also concerned with the majority's summary recital that it finds "no statutory, constitutional, or policy grounds" which would operate to defeat our jurisdiction under Section 11–721. The constitutional considerations are obvious and the statutory considerations only slightly less so. Certainly a time-consuming appeal, which

21. The majority's analysis of this factor, analogizing a civil commitment trial to a habeas corpus hearing, is unpersuasive. It is incorrect to state that the question of whether or not the patient is currently mentally ill is always at issue in a habeas corpus action brought by a patient seeking release from involuntary confinement. That issue was of course present in the case cited by the majority, because the petitioner sought release from confinement "primarily on the ground that he had recovered his sanity and was no longer dangerous to himself or others." *Dixon v. Jacobs*, 138 U.S.App.D.C. 319, 322, 427 F.2d 589, 592 (1970). In contrast, a patient might seek a writ on the ground that his confinement was illegal by virtue of a jury finding of nondangerousness and the subsequent noncompliance by the authorities with the terms of the Act. The patient's current mental status would not be before the court for determination in such a case; rather, the issue would be, given the jury's findings, is his confinement legal?

22. Thus, for example, the Act provides for involuntary emergency hospitalization only where a certified *emergency* exists and only for a period of *24 hours* until a psychiatrist on duty at the admitting hospital can examine the person alleged to be mentally ill. D.C. Code 1973, §§ 21–521 and –522. A person alleged to be mentally ill may not be detained beyond an initial *48 hour period* without a court order. *Id.* §§ 21–521, –523. Section 21–524 then requires the court receiving a hospital's petition for emergency observation and diagnosis of persons temporarily detained under the Act to review the written record and make a determination within *24 hours* as to the appropriateness of further hospitalization for a *seven-day period*. The court must either order the seven-day involuntary hospitalization or order the person's *immediate release*. If the court orders the seven-day hospitalization, § 21–525 requires that upon the patient's request, a probable cause hearing on the issue of his further hospitalization must be held *within 24 hours* after receipt of the request for a hearing. If a hearing is held and probable cause is found, other provisions come into play. Section 21–542, for example, requires the Mental Health Commission *promptly* to examine the patient and *promptly* to hold a hearing. Under § 21–544, if the Commission finds that

disrupts the expedited timetable forming the very core of the Act,[22] is inconsistent therewith. The Act's primary thrust was to secure the civil and constitutional rights of a long-neglected group.[23] It evolved out of a "profound congressional concern for the liberties of the mentally ill." *Covington v. Harris*, 136 U.S.App.D.C. 35, 41, 419 F.2d 617, 623 (1969). Thus, provisions were written to insure that no one would be hospitalized against his or her will for an unnecessarily lengthy period, unless a jury or trial court determined the patient to be mentally ill *and* dangerous. It is noteworthy here that even with several continuances of the Mental Health Commission hearing, less than four months elapsed between the emergency admission of Mr. Lomax and the signing of the release order, in conformance with the Act's provisions. In contrast, his confinement by order of this court has already lasted twelve months and could last indefinitely. This is the very indignity that the Act was designed to prevent.

I think the facts of this case demonstrate quite vividly the danger of inferring a right to appeal by the government. Unless it is held that that right does not include the ancillary right to seek a stay of the release order pending appeal, I see a threat to individual rights and the emasculation of a statute specifically tailored to protect those less able to assert such rights.

### III.

Finally, the majority holds that the respondent's trial counsel's opening remarks were so prejudicial to the government as to require reversal of the verdict in his favor. While I see no reason to reach this issue, I am convinced that if any error occurred during the opening statement, it was cured by the instructions of the trial judge, whose refusal to declare a mistrial certainly did not, in my opinion, amount to an abuse of discretion.[24]

Quite apart from counsel's isolated comment, several witnesses made reference to respondent's prior trial. Such references can be expected in any retrial situation and certainly could not have been unexpected in this case in view of the trial court's denial of the request—made by respondent's counsel—to limit testimony to events subsequent to the first trial. Moreover, I fail to see how the government is prejudiced by a jury being informed that the respondent was found not dangerous at some prior time, since the ultimate issue is the respondent's *present* mental condition and not his condition at the time of the previous

---

a person is not mentally ill and dangerous, it shall *immediately* order his release. If, on the other hand, the Commission finds that the respondent is mentally ill and dangerous, § 21–545(a) requires the court *promptly* to set the matter for a hearing and, if a jury trial is requested, it shall be accorded with *all reasonable speed.* Finally, § 21–545(b) requires that upon a finding by the court or jury, as the case may be, that the patient is either not mentally ill or not dangerous, the court *shall dismiss the petition and order his release.*

23. *In re Ballay*, 157 U.S.App.D.C. 59, 71–72, 482 F.2d 648, 660–61 (1973); *Covington v. Harris, supra* note 20, at 41, 419 F.2d at 623; *Protecting the Rights of the Mentally Ill*, S.Rep.No.925, 88th Cong., 2d Sess. (1964);

*Hearings on the Constitutional Rights of the Mentally. Ill Before the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary*, 91st Cong., 1st and 2d Sess. (1969–70).

24. *See, e. g., Frazier v. Cupp*, 394 U.S. 731, 734–37, 89 S.Ct. 1420, 22 L.Ed.2d 684, *aff'g* 388 F.2d 777 (9th Cir. 1969); *Robinson v. United States*, D.C.App., 361 A.2d 199, 200 (1976); *Smith v. United States*, D.C.App., 315 A.2d 163, *cert. denied*, 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974); *Mares v. United States*, 409 F.2d 1083, 1085 (10th Cir. 1968), *cert. denied*, 394 U.S. 963, 89 S.Ct. 1314, 22 L.Ed. 564 (1969); *Carsey v. United States*, 129 U.S.App.D.C. 205, 392 F.2d 810 (1967).

verdict.[25] Both the majority and petitioner have noted that the outcome of the prior trial was "irrelevant." In view of the likelihood of disclosure of the prior trial, I think it preferable that it be made by the trial court, accompanied by appropriate instructions. I offer, therefore, a suggestion previously made in reference to the identical problem arising in the context of criminal trials:

> In retrials, references to previous trials are likely to be made. Such references may sometimes be prejudicial to the party who does not make them. We think the ultimate objective of a fair trial is most likely to be achieved if at the outset of a retrial the judge gives a cautionary instruction, as some judges in this circuit do, to the following effect: 'The defendant has been tried before. [If there has been a mistrial, so state.] You have no concern with that. The law charges you to render a verdict solely on the evidence in this trial' [*Carsey v. United States*, 129 U.S.App.D.C. 205, 207, 392 F.2d 810, 812 (1967).]

Such an instruction seems particularly appropriate where, as here, the issues before the two juries are not in fact identical.

### IV.

In conclusion, I am concerned that the majority today is destroying the effectiveness of a statutory scheme designed to protect the rights of the mentally ill. It is doing so at a time when other jurisdictions are adopting the protections employed therein as representing an enlightened approach and one required by the Constitution.[26] I would dismiss this appeal, lift the court's stay, and permit Mr. Lomax to be released from his illegal confinement. I respectfully dissent.

25. This is, of course, why an appeal and retrial are not contemplated by the Act.

26. *See* state and federal cases cited in notes 8 and 16, *supra.* It has been held in these decisions that due process mandates not only the substantive commitment standard set forth

in the Act, but many of its specific procedural safeguards as well, including adequate prior notice, a prompt hearing, and the assistance of counsel. *See particularly Lynch v. Baxley, Bell v. Wayne County Gen. Hosp.* and *Lessard v. Schmidt, supra* note 8.